**Affirmed and Opinion filed November 17, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00731-CR

---

**MIGUEL MARTINEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1374263**

---

## O P I N I O N

Appellant Miguel Martinez appeals from his conviction for murder. After the trial court denied appellant's motion to suppress his videotaped statement, appellant pleaded guilty pursuant to a plea agreement with the State. The trial court then found appellant guilty and sentenced him to 20 years in prison in accordance with the plea agreement. In three issues, appellant contends that (1) the trial court erred in denying his motion to suppress because a coercive interrogation

rendered his statement involuntary, (2) he received ineffective assistance of counsel when his counsel revealed confidential attorney-client communications without consent, and (3) his guilty plea was involuntary due to coercion. We affirm.

## *Background*

The indictment in this case alleged that appellant "on or about January 5, 2006 . . . unlawfully, intentionally and knowingly cause[d] the death of Senovia Medina . . . by an unknown manner and means." Appellant filed a motion to suppress his videotaped statement made while under arrest. Immediately prior to the hearing on the motion to suppress, a discussion concerning plea negotiations occurred between appellant, the trial judge, and counsel representing both sides. During this exchange, defense counsel informed the judge that appellant was willing to plead guilty in exchange for a 15-year prison sentence but that the State was not willing to offer less than 20 years in prison.

The relevant portion of the exchange was as follows:

> [**THE COURT:**] So there [are] certain things you get to decide. You decide if you want to plead guilty and enter into a plea bargain and have me sentence you, or if you want to plead not guilty and have a trial.
>
> And I understand you have decided you want a trial, which is fine.
>
> [**DEFENSE COUNSEL**]: Well, technically, Your Honor, he does want to plead guilty. He wants to plead guilty. He wants—he—yesterday, he was very close to signing the papers. The problem is, he doesn't like the time. So it's not so much that he wants a jury trial, it's just that he has no other choice.
>
> Is that correct, Miguel? He told me this morning he would sign for 15 years.
>
> **THE COURT:** All right. And the State's offered 20; is that right?

2

[**PROSECUTOR**]:  Yes, Your Honor.

**THE COURT:**  Okay.

[**DEFENSE COUNSEL**]:  So, it's a matter of five years that we're going to trial over, five years.

**THE COURT:**  Which is not really a very good use of taxpayers' money.  But if the State believes the jury will go 20 years or more, then they may not come down any lower.  And they have a statement from him?

[**DEFENSE COUNSEL**]:  Exactly.  And I have informed him that based upon my experience, last week in trial, where they gave my client life where no one died, that if he gets convicted of murdering a pregnant woman, dumping her body in a garbage bag—

**THE DEFENDANT:**  That is not what happened.  That's not what happened.

[**DEFENSE COUNSEL**]:  He is probably going to get life.

**THE COURT:**  You're not allowed to interrupt when somebody else is speaking.

**THE DEFENDANT:**  My apology.

[**DEFENSE COUNSEL**]:  I warned him there is a strong possibility he might get life.  He wanted to speak with the prosecutor yesterday.  The bailiff facilitated his every wish so far.  The prosecutor and him spoke yesterday.  And he looked him in the eye— the prosecutor looked [appellant] in the eye and said, I'm not giving you anything less than 20.  And he said, I'm going to be asking for life from the jury.  So he is very well aware of what is about to happen.

**THE COURT:**  Okay.  So if you prefer to take your chances at trial, of course you have a constitutional right to do that.

At the hearing on the motion to suppress, James Wilson testified that in May 2011, he was a homicide detective in the Houston police department when his attention was drawn to a "cold case" that he believed might be solvable.  He explained that the primary suspect in the murder investigation was appellant, whom police had learned was manufacturing illegal silencer devices for use on

3

pistols. Based on that information, police obtained a search warrant for appellant's residence. The subsequent search uncovered illegal devices. Appellant was arrested and transported to the homicide division where Wilson met with him on three consecutive days.

Wilson said that appellant was "kind of standoff-ish [sic]" at first, so Wilson just talked with appellant regarding his personal history for most of the first two days in order to establish a rapport. On the first day, Wilson read appellant his *Miranda* rights,[1] but about halfway through the list, appellant interrupted, saying that he knew his rights and was not requesting an attorney. On the second day, Wilson read appellant the complete list of *Miranda* rights and told appellant he was entitled to stop the interview at any time. Appellant again indicated that he waived his rights and wished to talk. According to Wilson, he and appellant spoke for about eight hours on the day of appellant's arrest and seven hours the next day. Wilson said that, during the three days, he did not deprive appellant of food, water or restroom breaks and even provided fast food meals. Wilson further said that he did not threaten or coerce appellant or make any promises, and appellant did not appear to be under the influence of drugs or alcohol. At no point did appellant request to speak with an attorney. At some point on each of the first two days, Wilson mentioned Medina, the cold-case victim, who had been appellant's girlfriend. On the second day, Wilson specifically asked appellant to take him to where Medina's body was buried so her family could find closure, and appellant said, "I know what's going to happen here. I confess to you, you're going to go out in that hallway and high-five all those detectives out there. I have seen this on TV and I know what's about to happen." Wilson then changed the subject. Wilson also reminded appellant at one point that appellant had previously "failed"

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

4

two polygraph examinations regarding Medina's murder.

At the end of the second day, appellant said that if he could talk to his wife and she agreed to stay with him "during this time," he would give Wilson a full confession the next day. Wilson agreed. On the third day of appellant's detention, Wilson permitted appellant to make a private telephone call to his wife. Afterwards, Wilson turned on the video equipment in the interview room and recorded the entirety of his conversation with appellant. Near the beginning of the recorded interview, Wilson read appellant his *Miranda* rights, and appellant indicated he understood and waived those rights. At no point did appellant request an attorney or ask to terminate the interview.

During the recorded interview, appellant stated that he and Medina were at their home when she became angry at him because she believed he had been talking to another woman on the telephone. Medina came at him with a letter opener. He said that he was afraid she was going to stab him in the neck, so he deflected the blow and pushed her to the side, causing her to fall and hit her head on the side of a shower. He said that she did not get up and, despite his attempts at CPR, she did not revive. He acknowledged that Medina was pregnant at the time of her death. Appellant explained that he was very confused regarding what to do and too nervous to call the police or an ambulance. He put Medina's body in a garbage bag while he pondered what to do and then later dumped her body in a rural area. He said he returned to the area three times in order to bury Medina but could not find her body. Although appellant expressed skepticism regarding whether they would be able to find the body, he agreed to take Wilson to where he remembered leaving it. Wilson testified that when they walked around the indicated location, appellant said he could not recall specifically where he had left the body. The body was never recovered. Also on the videotape, appellant can be

5

seen becoming distraught and asking Wilson if he could make the charges go away. He also told Wilson toward the end of the tape that "you have not mistreated me."

Appellant, who also testified at the hearing, acknowledged Wilson read him his *Miranda* rights on the first day but that he then told Wilson he did not wish to speak to him anymore and wanted a lawyer present. Appellant said that he was "red-banded" at the jail, meaning he could not make telephone calls. Appellant acknowledged that Wilson never deprived him of food, water, or the use of the restroom, did not threaten him, and did not promise to have the charges dropped.

Appellant said that on the second day, Wilson did not read him his *Miranda* rights.[2] He voluntarily talked to Wilson but still requested a lawyer be present. Appellant said he did not want to talk to his wife on the third day, but Wilson insisted. He denied that he spoke to Wilson voluntarily and said he could not remember clearly what happened on that day because he was "under the influence of medication." Appellant asserted that at the time he was in jail, he was on medication for depression. At his request, jail personnel gave him a sleeping pill and another inmate gave him "some paper to put under [his] tongue" to help him sleep the second night. Appellant reiterated that Wilson did not threaten him but, on the third day, Wilson's partner threatened to hurt appellant if he did not tell them what they wanted to hear.

After the trial court denied appellant's motion to suppress, appellant accepted the plea agreement, and pursuant to that agreement, he pleaded guilty and was sentenced to 20 years in prison. In her findings of fact, the trial judge

---

[2] During the videotaped interrogation on day three, Wilson asked at one point whether appellant recalled when the day before Wilson had read appellant's *Miranda* rights and told him that he could stop the interview at any time but appellant indicated he still wished to talk to Wilson. On the videotape, appellant did not deny that this had occurred.

6

specifically stated that she found Wilson to be a credible witness.

### *Motion to Suppress*

In his first issue, appellant contends that the trial court erred in denying the motion to suppress because, he argues, the inherently coercive interrogation resulted in an involuntary statement. We review for abuse of discretion a trial court's ruling on a motion to suppress a statement as involuntary. *Delao v. State*, 235 S.W.3d 235, 238–39 (Tex. Crim. App. 2007). In this context, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the evidence presented at the hearing on the motion. *Id.* at 239. A trial judge's decision on the admissibility of evidence will not be reversed if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

Article 38.21 of the Texas Code of Criminal Procedure provides that a statement of an accused may be used as evidence against him if it appears that the statement was freely and voluntarily made. Tex. Crim. Proc. Code art. 38.21. A statement is involuntary if it was taken in violation of due process or due course of the law because the statement was not freely given due to coercion, force, or improper influence. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996). Under due process analysis, a statement is involuntary if the defendant was offered inducements of such a nature or coerced to such a degree that the inducements or coercion produced the statement. *See Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). In determining whether a statement was made voluntarily, we consider the totality of the circumstances under which the statement was obtained, including such factors as the length of detention, denial of

7

access to family members, lack of sleep, and lack of food. *Nickerson v. State*, 312 S.W.3d 250, 258-59 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). The ultimate question is whether appellant's will was overborne. *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997). Of principal concern are the characteristics of the accused and the details of the interrogation. *Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010).

Appellant asserts that the totality of the circumstances compels the determination that the inherently coercive nature of the interrogation rendered his statement involuntary. More specifically, he contends that the very length of the interrogation—over fifteen and a half hours—was coercive given his vulnerable state. He further points out that he was not permitted to telephone friends or family during much of the three day period, and he asserts he requested and was denied access to a lawyer before making the videotaped statement.

We begin by noting that appellant does not specify what made him particularly vulnerable at the time of the interviews. Certainly, being detained and questioned by police is a stressful situation. *See Carter v. State*, 309 S.W.3d 31, 35 (Tex. Crim. App. 2010) (noting "the coercion inherent in custodial interrogation"). If appellant intended to reference his mental health, the only evidence he produced in support of that was his own testimony, which the trial court could have found unpersuasive.[3] *See Delao*, 235 S.W.3d at 239. The trial court also could have disregarded appellant's testimony that he requested but was not provided an attorney, particularly in light of Wilson's testimony to the contrary. *See id*.

The length of appellant's interrogation is an important factor in the analysis,

---

[3] Appellant's counsel attempted to elicit testimony that appellant was at some point diagnosed with depression or was "on pills" or was suffering delusions, but appellant's answers did not address those issues, except that he was unable to sleep in jail during the interrogation.

but we do not find it to be dispositive. *See, e.g., Fineron v. State*, 201 S.W.3d 361, 366 (Tex. App.—El Paso 2006, no pet.) ("The length of the interrogation is one factor to be considered in determining whether a suspect's statement is coerced. . . . However, a lengthy interrogation does not automatically render a statement involuntary."). Although Wilson interviewed appellant for approximately 15 hours and 40 minutes in total, that time was spread over three days; the vast majority of it was spent in what Wilson called "building rapport" and, according to Wilson, appellant indicated he wished to continue talking for the second and third days. *See, e.g., Smith v. State*, 779 S.W.2d 417, 428–29 (Tex. Crim. App. 1989) (holding eight hours of aggressive questioning without food and after defendant had not slept the night before did not render confession involuntary in light of defendant's willingness to continue). Wilson further testified that at no point did he threaten or abuse appellant, make him any promises, or deprive him of food, water, or restroom breaks. Indeed, appellant said at the end of the videotaped third interview that Wilson had not mistreated him. Lastly, appellant argues that, because he was "red-banded" at the jail, he was not permitted to telephone family or friends. Although denial of access to family members is a circumstance to consider, the record does not demonstrate that appellant requested to speak to his family members. *See, e.g., Nickerson*, 312 S.W.3d at 258-59. In addition, appellant was permitted to speak privately with his wife before making his recorded statement.

Although the overall length of the interrogation was somewhat coercive in nature, under the totality of the circumstances detailed above and under the appropriate standard of review, we conclude the trial court did not abuse its discretion in denying the motion to suppress because appellant's videotaped statement was voluntarily made. *See* Tex. Crim. Proc. Code art. 38.21; *Nickerson*, 312 S.W.3d at 258-59. We overrule appellant's first issue.

9

## *Assistance of Counsel*

In his second issue, appellant asserts he received ineffective assistance of counsel because his trial counsel violated the attorney-client privilege by revealing confidential communications to the court without appellant's consent. An appellate court reviews the effectiveness of counsel according to the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Under this standard, a defendant must (1) demonstrate that trial counsel's performance was deficient and fell below an objective standard of reasonableness, and (2) "affirmatively prove prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Review of a trial counsel's performance is highly deferential, as there is a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Ordinarily, trial counsel should be afforded an opportunity to explain his or her actions, and in the absence of such opportunity, an appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). The appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective, and any allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 813.

Texas Rule of Evidence 503(b)(1) sets out the general rule of attorney-client privilege in Texas: "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the

purpose of facilitating the rendition of professional legal services to the client." Tex. R. Evid. 503(b)(1). Subsection (b)(2) adds a special rule for criminal cases, providing that "a client has a privilege to prevent the lawyer . . . from disclosing any other fact which came to the knowledge of the lawyer . . . by reason of the attorney-client relationship." *Id*. 503(b)(2). The power to waive the privilege belongs only to the client or to his or her attorney or agent with the client's consent. *See Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997).

Appellant's contentions concern the on-the-record discussion regarding plea negotiations that occurred between appellant, the trial judge, and counsel. During this exchange, defense counsel told the judge that appellant was willing to plead guilty in exchange for a 15-year prison sentence but that the State was not willing to offer less than 20 years. The record indicates that counsel asked appellant, "Is that correct?" in front of the judge but the record does not contain any reply by appellant. Counsel then went on to describe the dire situation appellant found himself in, with the State holding a statement in which appellant acknowledged Medina was pregnant when he caused her death and he dumped her body in a garbage bag. Appellant then interrupted, saying "[t]hat is not what happened," which appellant argues evidences that he did not consent to counsel's discussion of plea negotiations. We conclude this is not a reasonable inference. Defense counsel finished by stating appellant wanted to speak with the prosecutor the day before and the prosecutor told appellant he was not willing to offer anything less than 20 years and was going to ask the jury for a life sentence.

Appellant argues that this exchange satisfies the first prong of *Strickland*. Even if counsel revealed an attorney-client communication, appellant has not met his burden of proving counsel's ineffectiveness.[4] We do not review counsel's trial

---

[4] We note that appellant may have agreed beforehand to counsel's informing the judge or

decisions in hindsight and we strongly presume counsel's competence. *Wenzy v. State*, 855 S.W.2d 47, 49 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). Appellant has not shown that the disclosure before the judge, who was not the factfinder, was unreasonable under professional norms. *See Thompson*, 9 S.W.3d at 813. Accordingly, we overrule his second issue.

### *Guilty Plea*

In his third issue, appellant contends that coercion by the prosecutor and defense counsel rendered his guilty plea involuntary. For a guilty plea to be constitutionally valid, it must be entered knowingly and voluntarily. *See Fuller v. State*, 253 S.W.3d 220, 229 (Tex. Crim. App. 2008). In considering the voluntariness of a guilty plea, we examine the record as a whole. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998) (per curiam). If the trial court properly admonished the defendant before the plea was entered, there is a prima facie showing that the plea was both knowing and voluntary. *Id.* The burden then shifts to the defendant to show that the plea was involuntary. *See id.* A defendant who attests at a plea hearing that his plea is voluntary bears a heavy burden to later establish that he entered the plea involuntarily. *Houston v. State*, 201 S.W.3d 212, 217 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Here, appellant stated at his plea hearing that no one had forced or threatened him or promised him anything to get him to plead guilty. He further acknowledged that he was pleading guilty because he was guilty. Additionally,

---

appellant could have disclosed the same information to the prosecutor in their meeting. In either case, there would be no violation of the attorney-client privilege. *See* Tex. R. Evid. 511(a) (providing that a privilege against disclosure is waived if the person holding the privilege either discloses or consents to the disclosure of any significant part of the privileged matter); *Carmona,* 941 S.W.2d at 953. We will not speculate on a silent record regarding what was said between appellant and his counsel or the prosecutor. *See Strickland*, 466 U.S. at 689; *Goodspeed*, 187 S.W.3d at 392; *Thompson*, 9 S.W.3d at 813.

appellant signed plea papers and admonishments, waiving his rights to a jury trial, to confront the witnesses against him, and against self-incrimination. In signing the documents, appellant further confessed to causing Medina's death and affirmed that his plea was made voluntarily. The signed admonishments also explained the applicable range of punishment and the effect of the plea agreement. Appellant therefore bears a heavy burden to establish that his plea was involuntary. *See Martinez*, 981 S.W.2d at 197; *Houston*, 201 S.W.3d at 217.

Appellant's contention that the prosecutor and defense counsel coerced his guilty plea is based on the same exchange with the trial judge discussed above regarding his allegation he received ineffective assistance of counsel.[5] Appellant asserts basically that the prosecutor's threat of requesting a life sentence in the event the case went to trial and defense counsel's suggestion that she had recently had a client receive a life sentence for a lesser crime and statements regarding the weakness of appellant's case coerced him into pleading guilty. We do not agree with appellant's assessment of the prosecutor's and defense counsel's statements.

Appellant had confessed to causing the death of his pregnant girlfriend and then dumping her body in a garbage bag. The prosecutor may very well have sought a life sentence had the case gone to trial. Defense counsel may reasonably have concluded that appellant's case was weak and a 20-year plea agreement was a good deal for him. *See Coker v. State*, 405 S.W.3d 356, 361 & n.7 (Tex. App.— Texarkana 2013, no pet.) (holding appellant's waivers of rights and judicial confession were "on the sage advice of counsel (rather than coercion)"); *Moses v. State*, No. B14-87-00662-CR, 1989 WL 40656, at *1 (Tex. App.—Houston [14th Dist.] April 27, 1989, pet. ref'd) ("There is a big difference between being persuaded based on the sobering advice of counsel, as happened here, and being in

---

[5] *See supra.*

13

any way coerced or forced against one's will to enter a guilty plea."). The complained-of statements are neither inherently coercive nor coercive under the circumstances of this case. Accordingly, we overrule appellant's third issue.

### *Pro Se Briefing*

Lastly, we note that appellant has filed a pro se brief in addition to the brief filed by his appointed counsel. An appellant in a direct criminal appeal is not entitled to hybrid representation. *See Ex Parte Dupuy*, No. 14–15–00677–CR, 2016 WL 3268442, at *5 (Tex. App.—Houston [14th Dist.] June 14, 2016, no pet.); *Laney v. State*, 76 S.W.3d 524, 533 (Tex. App.—Houston [14th Dist.] 2002), *aff'd*, 117 S.W.3d 854 (Tex. Crim. App. 2003). Nevertheless, we have examined the issues and contentions in the pro se brief and find no allegations of error that bear consideration in the interests of justice. *See Dupuy*, 2016 WL 3268442, at *6; *Burgess v. State*, 790 S.W.2d 856, 861–62 (Tex. App.—Houston [14th Dist.] 1990), *aff'd*, 816 S.W.2d 424 (Tex. Crim. App. 1991).

We affirm the trial court's judgment.


/s/  Martha Hill Jamison
    Justice


Panel consists of Justices Boyce, Christopher, and Jamison.
Publish — TEX. R. APP. P. 47.2(b).

14