**Affirmed and Memorandum Opinion filed July 31, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00595-CR

---

### JOHNTAY GIBSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1378280**

---

## M E M O R A N D U M    O P I N I O N

A jury convicted appellant Johntay Gibson of capital murder. The trial court sentenced appellant to life in prison, without the possibility of parole. On appeal, appellant claimed: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in denying his motion to suppress; (3) the jury charge was erroneous; and (4) reversible error occurred during his closing argument. We affirmed. The Texas Court of Criminal Appeals granted appellant's petition for

review, reversed our judgment, and remanded with instructions to consider appellant's trial objection to the admission of the second part of his videotaped statement. *Gibson v. State*, 541 S.W.3d 164 (Tex. Crim. App. 2017). We again affirm.

## I.    THE EVIDENCE

On February 18, 2013, Hamid Waraich, the owner of a Boost Mobile phone store in Harris County, Texas, was shot and killed. Waraich's wife, Mirna Cortez, was present and witnessed the shooting, along with a customer, Rosemary Saldana and her two grandchildren.

Cortez testified two men entered Boost and one remained at the door (the "lookout") while the other approached her at the register (the "shooter"). Saldana was near the front door with the children. The shooter had on a mask that completely covered his face, a jacket and gloves, and a pistol in his hand. The lookout was also wearing a mask and gloves and had a gun, which he pointed at Saldana and the children. He told Saldana to get on the floor and demanded her purse. Saldana gave the lookout her bag which contained her bank debit card. The masks prevented Cortez from seeing the men's faces but she described the shooter as a little taller and thinner than the lookout. Saldana described the two suspects as wearing all black from head to toe, including black masks, and one was significantly taller than the other. The shorter man was by the door and the taller man approached the cashier.

The shooter took money from the register and three cellphones on top of the counter. One phone belonged to Cortez but the other two had not been activated. The shooter placed Cortez's cellphone in the pocket of his jacket. He then pointed his gun at Cortez and demanded her jewelry. Cortez showed her hands, said she did not have any, and backed up. Cortez heard a gunshot and realized the man had shot Waraich. A fired cartridge case was recovered from behind the counter on which

was printed, "PPU 380 auto."[1] Saldana also heard only a single shot which came from the counter. She testified the tall robber shot Waraich. The man at the door began screaming, "let's go." The two men ran out and Cortez called 911.

Video footage from a nearby store, Melrose Family Fashions showed the suspects walking towards Boost before the robbery and then sprinting north toward the Payless shoe store afterward.

Sergeant James Devereux[2] and Officer Crank spoke to Monica Castro and Selene Gutierrez from Melrose and Elizabeth Diaz at Dollar Land and were given descriptions of each suspect's height and race. Devereux and Crank proceeded to a nearby auto repair shop where Joel Montalvo gave them a description of the suspects' vehicle – a black Pontiac Grand Prix with paper plates and license number "47K8036."

Gutierrez, the manager of Melrose, testified that about 4:30 p.m. on February 18, 2013, she saw two people walking toward Boost wearing black sweaters and hoodies. Their faces were uncovered and she could see the men were African-American. One man was taller than the other. Later, she saw the tall man run by followed by the other man, wearing a ski mask, in the direction of Payless. Castro, an assistant manager at Melrose, also noticed the two men walk by wearing dark clothing and hoodies. Castro saw their faces and they were African-American.

Montalvo saw two people running to a car, an Oldsmobile or a Pontiac, with paper plates, backed into a spot in front of Payless. One went in the back on the driver's side and the other went in the front on the passenger side. Montalvo was unable to give any description of the men.

---

[1] "PPU" was identified as the brand of ammunition.

[2] All officers referred to in this opinion were from the Houston Police Department.

Sergeant Matthew Brady showed Gutierrez and Castro two sets of video lineups with possible suspects in them. In the first video, appellant was in position number three. Brandon Johnson was in position number two in the second video. When Brady showed Castro the first lineup, she stated that she was sixty to seventy percent certain that she saw number three (appellant) walk past her towards Boost and that he was the shorter one. When Brady showed Castro the second lineup, she did not recognize anyone.

Brady showed the same lineups to Gutierrez. When she viewed the first one, Gutierrez said number three (appellant) or four could be the taller one. Brady testified that Gutierrez then viewed the second lineup and identified number one as the short suspect. Gutierrez testified that she tentatively identified appellant as the taller man she saw that day and identified Johnson as the shorter man.

The day after the robbery, Saldana reported the theft to her bank of her debit card and discovered it already had been used. Bank records revealed unauthorized activity at a McDonald's and Murphy's gas station. At Murphy's, someone attempted to use Saldana's card three times with an invalid pin but the card was used successfully at McDonald's.

Officer Mark Stahlin obtained surveillance video from McDonald's showing "a dark-colored Pontiac with a paper license plate" going through the drive-through. The car appeared to be a Grand Prix; the people inside were not visible but the first three digits of the license number were "47K." According to the cashier, there were three people in the car. At Murphy's, Stahlin retrieved video surveillance that showed the same black Pontiac at a gas pump. A person exited the car from the front right passenger seat and attempted to use a card. Stahlin identified the person on the video as appellant, "but he's put on weight since then." The man was wearing a large

shiny earring in his ear that Stahlin testified was consistent with one appellant was wearing on February 20, 2013, at the homicide division.

Sergeant C. E. Elliott testified the McDonald's video reflected the driver was wearing light-colored clothes, not necessarily white, but a very light color. Elliott identified the person in the surveillance videos from Murphy's and McDonald's as appellant and stated, "He had a big star-shaped earring in his ear and he was wearing it when he got arrested."

Cortez's phone was tracked to a cellphone store in a Fiesta supermarket. The owner, Hein Bui testified a man sold him two cell phones on February 19, 2013. From surveillance video of the transaction, Elliott identified the seller as appellant.

Elliott testified the black Pontiac Grand Prix was registered to Jermaine Green at apartment 102 of the Crescent Place Apartments at 10222 South Gessner, a location within walking distance of the Fiesta. Near apartment 102 were parked a black Grand Prix and a white Grand Prix, also with paper plates. Surveillance was established on both vehicles. A black male walked from the area of apartment 102 and entered the white car. Officers Nathan Carroll and Cullen Duncan began following and after the driver committed several traffic violations, initiated a traffic stop.

The driver was the only occupant and identified himself as Jermaine Green but produced no license. Carroll and Elliott identified appellant as the man in the car. According to Elliott, "he's gained a lot of weight." When he first made contact with the driver, Carroll observed the odor of marijuana. Carroll checked the name and date of birth the man gave him and, according to the Texas driver's license photo, he was not that person. When Carroll confronted him, the man gave his name as Johntay Gibson and a different date of birth. Carroll then found appellant had three outstanding warrants.

5

Appellant was dressed all in black and Elliott observed a black ski mask laying on the back seat. Appellant consented to a search of the vehicle and Duncan recovered three small plastic bags of marijuana under the driver's seat. Appellant was arrested, taken into custody, and transported to the homicide division.

Elliott returned from the stop to Crescent Place and saw two people walk from the area around apartment 102 to the black Grand Prix. The taller of the two went "into the driver's door. Close[d] it. . . . and then they walk[ed] away." About five minutes later, that man entered a tan Buick Riviera parked nearby. Elliott radioed officers to follow and when the driver committed a traffic violation he was detained. The driver was Jermaine Green and he gave consent to search the vehicle. As a result of the investigation, Elliott eliminated Green as a suspect but believed Johnson and appellant were involved, as well as a third man, the lookout. The suspect developed as the lookout was a man known as "Little E."

The man that had been with Green watched the traffic stop but ran into apartment 102 when officers approached him. Officers "knocked and announced" and the man, Brandon Johnson, came to the door; he had changed his clothes.

After consent was given, Officer Jamie Peoples searched the apartment. From the bedroom nightstand, Peoples took into evidence two blue "do-rags," a black ski mask with face holes, and a blue and white bandana. On the floor by the bed, Peoples recovered a black do-rag. In the closet, Peoples found a safe as well as a duffle bag containing two ski masks with face holes, one blue and one black. Peoples also found a pair of black sweatpants in the dresser. Peoples recovered a box containing cellphones and credit cards, one in Johnson's name. Two sweatshirts, one blue and hooded, and two pairs of sweatpants, one blue and one black, were found. An empty black gun holster was recovered along with a box containing ammunition – eight unfired PPU .380 auto rounds – a do-rag, a blue bandana, and appellant's birth

6

certificate. When the safe was opened, it contained a box of ammunition – thirty-four Monarch .380, copper-jacketed hollow-point bullets; a ski mask, a bandana, a tax form for Green; credit cards in Green's name, and a state identification card for appellant. Cortez, Saldana, and Gutierrez testified the ski masks found were similar to those worn by the robbers.

Pursuant to a warrant, Officer Alton Holmes searched the black Grand Prix. He found a single black knit glove inside the map pocket of the driver's door, and a pair of gray and black Ridell brand sports gloves and a Boost Mobile receipt for appellant's phone in the glove box. Holmes also searched the white 1999 Pontiac Grand Prix and found a black knit beanie. In the tan Buick Riviera, Holmes found black Ridell sports gloves in the trunk.

Chandler Bassett, a firearms examiner for the Houston Forensic Science Center, testified it was possible the bullet jacket and cartridge case recovered from Boost were fired from the same weapon. Further, Bassett testified, the recovered cartridge case and the ammunition found in both the apartment closet and the safe from the apartment were of the same brand and caliber.

Officer Duplechain took custody of appellant and gave him the *Miranda*[3] warnings at approximately 4:30 p.m. Appellant acknowledged that he understood and agreed to waive his rights and give a statement, of which a visual and audio recording was made. Duplechain left the interview at approximately 5:15 p.m. and returned around 10:35 p.m. During the break, appellant was frequently asleep.

During the interview conducted from 4:30 p.m. to 5:15 p.m., appellant stated he gave Green's name and date of birth to the officers because there was a warrant out for his arrest. Appellant said he lived with Brandon Johnson. Appellant gave

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Duplechain permission to look in his phone for the number of the girl whose car he was driving, the white Grand Prix. Appellant said the black Grand Prix was Green's car and Green also had an old brown car. Appellant denied driving or riding in the black Grand Prix on July 18 or 19.

In the latter portion of the interview, appellant was shown a photo and admitted it was him pumping gas and the time stamp was accurate. Appellant confirmed that Johnson was there and eventually identified the third person involved as Eric. He said they called Eric "Lil" because "He shorter than me, he a midget."

According to appellant, it was "their" idea and he only offered to drive. Johnson and Eric were not wearing masks when they got out of the car but were wearing ski masks when they returned. They removed the masks when they returned. Appellant said he thought they were going to beat someone up until he heard a gunshot. They showed him the gun afterwards and Eric took it when he left the car. Appellant described it as black, a nine or 380, with a magazine. They said they robbed Boost, appellant was given $100 of the approximate $300 taken, but denied shooting anyone, claiming "they shot in the store." Appellant knew from the news the man had been shot in the chest.

According to appellant, he was the driver, Johnson sat in the front, and Eric sat in the back but he and Johnson switched places before they drove to McDonald's. After he put gas in the car, appellant got back in the driver's seat. Appellant admitted to selling Cortez's phone but claimed Johnson gave it to him. Appellant denied calling his girlfriend, Kenisha, on the phone. At approximately 11:30 p.m., appellant invoked his right to an attorney and Duplechain immediately concluded the interview.

Duplechain then questioned appellant's brother, Joseph Davis. Davis was unaware appellant had been taken into custody until he was interviewed by

8

Duplechain. Davis said that appellant had spoken about the robbery and told Davis that he "didn't mean to kill him . . . it just happened . . . the plan wasn't to go in and kill him." Davis did not know who the shooter was.

Washington was developed as a third suspect during that interview and Davis identified him from a photo spread. Duplechain testified that phone calls to Washington in the immediate aftermath of appellant's arrest indicated a relationship between Washington and appellant. According to Duplechain, "Washington would have had the perfect vantage point to – to say who the shooter was because he entered the store with the shooter. . . . And he would have known who the shooter was and who the driver was." Duplechain testified that Washington was the one person who had seen appellant pull the trigger.

Phone records revealed that in the hours between the shooting and midnight, Johnson called appellant and then there were three calls between appellant and Johnson. Immediately after that, appellant accessed a news channel from his phone. From the phone records Duplechain concluded there was a close relationship between appellant and Washington. Further, appellant's explanation that Johnson and Washington were close was not borne out because they had minimal contact with each other.

According to appellant's statement, only he, Washington or Johnson would have had access to Cortez's phone. The surveillance video from Boost showed Cortez's phone was placed in the shooter's pocket. There had been a call from Cortez's phone to appellant's girlfriend, Kenisha, within three minutes after the phone was taken. Phone records revealed calls from both appellant's and Johnson's phones to Kenisha that Duplechain believed suggested Johnson was looking for appellant.

Elliott testified that appellant is "[r]ight at six feet tall" and he was personally part of taking that measurement. Brandon Johnson is approximately five feet eight inches. Eric Washington is approximately five feet three inches. Duplechain admitted that the State's theory that Washington was the lookout meant that both Johnson and appellant were taller. Based upon his review of the various surveillance videos and photos and his contact with Johnson, Washington, and appellant, Duplechain developed the opinion that the shooter was appellant.

Elliott testified the appearance of the men in the Melrose surveillance video going to and fleeing from Boost were consistent with appellant and Washington being those men. Washington gave three statements to Elliott. Elliott testified those statements did not change his mind regarding the suspects in the case. Charges were filed against appellant, Johnson, and Washington for capital murder.

## II. SUFFICIENCY OF THE EVIDENCE

In his first three issues, appellant asserts the evidence is insufficient to support his conviction for capital murder as either a principal, a party, or a co-conspirator. A person may be charged with an offense as a principal, a direct party, or a co-conspirator. *See* Tex. Penal Code § 7.01 (person is "criminally responsible" if offense is committed by his own conduct or by the "conduct of another for which he is criminally responsible"); Tex. Penal Code § 7.02(a)(2) (describing criminal responsibility for direct party); Tex. Penal Code § 7.02(b) (describing criminal responsibility for party as co-conspirator). As explained below, we conclude the evidence is sufficient to support appellant's conviction as a principal.

### A. Standard of Review

In determining sufficiency of the evidence, we consider all the evidence, both direct and circumstantial, and any reasonable inferences which can be drawn from

the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury is the sole judge of the credibility of the witnesses and the evidence presented. *See Villani v. State*, 116 S.W.3d 297, 301 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd.). We view all evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). We do not sit as the thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the jury's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and draw all reasonable inferences from basic facts to ultimate facts. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

### B. Analysis

To obtain a conviction for capital murder, the State was required to prove that appellant murdered the complainant and that the murder was intentionally committed during the course of a robbery. *See* Tex. Penal Code § 19.03(a)(2). Appellant first argues that there is legally insufficient evidence that he caused the complainant's death.

Specifically, appellant points out neither Cortez nor Saldana identified him as the shooter. Elliott could not identify appellant as the shooter from the Boost surveillance video and the shooter wore light-colored gloves but those were not the gloves found in the white Grand Prix appellant was driving when arrested. Appellant refers to Duplechain's failure to provide the specific heights of the suspects in his

11

offense report. He further claims appellant was only an inch or two taller than Johnson. Also, the lineup identifications by Castro and Gutierrez were inconclusive. Castro was only sixty to seventy percent certain she recognized appellant and said he was the short one, while Gutierrez was unsure as between appellant and another man as being the taller man she saw the day of the robbery. Appellant also argues the DNA evidence linking him to some of the evidence seized does not establish whether he touched those items before, during, or after the incident and fails to account for the fact all three suspects lived at the apartment and comingled their property. Lastly, appellant relies upon his admission that he acted as the driver for Johnson and Washington.

The jury heard the evidence set forth above. To summarize, Cortez and Saldana testified that that the taller of the two men shot Waraich. Castro and Gutierrez testified the two men were African-American and Gutierrez noticed one was taller than the other. The jury heard evidence that appellant is six feet tall and Johnson is five feet eight, a difference of four inches. Although Washington is shorter than both men, there was other evidence from which a rational trier of fact could find appellant was the shooter.

The shooter took Cortez's cellphone and placed it in his pocket. Within three minutes of the robbery, a phone call was placed from Cortez's cellphone to appellant's girlfriend, Kenisha. Appellant sold Cortez's cellphone to Bui the day after the robbery.

Montalvo described the suspect's vehicle as a black Pontiac Grand Prix with paper plates, license number 47K8036. Elliott testified that less than 29 minutes after the vehicle fled the scene, Saldana's credit card was used at McDonald's and within 42 minutes of the shooting, appellant vacated the front right passenger seat of the black Grand Prix and tried to use Saldana's card at Murphy's gas station.

12

Appellant told Duplechain that he was one of the three men involved in the robbery, although he claimed he was only the driver. However, according to Davis, appellant felt bad about it and that "he didn't mean to kill him, but he said it just happened. He didn't know him . . . the plan wasn't to go in and kill him."

During a search of the apartment where appellant lived with Johnson, officers found ammunition of the same caliber and manufacturer as the bullet recovered from Waraich's body and the cartridge recovered from Boost. The ammunition was in a box with appellant's birth certificate along with a bandana linked to appellant by his DNA. When appellant was stopped driving the white Grand Prix, a black ski mask was in the backseat and he gave a false name. Gray and black gloves, similar to the ones the shooter is shown wearing in the surveillance video from Boost, were found in the black Grand Prix and linked to appellant by DNA.

Although appellant stated that the extent of his role in the crime was as driver for Johnson and Washington, the jury considered evidence to the contrary. Viewing all the evidence in the light most favorable to the verdict, we hold a rational trier of fact could have found beyond a reasonable doubt that appellant caused Waraich's death. *See Gear*, 340 S.W.3d at 746. We therefore overrule issue one.

Having found the evidence legally sufficient to support appellant's conviction as a principal, it is unnecessary to determine whether the evidence is legally sufficient to support his conviction as a party or co-conspirator. We therefore do not address issues two and three.

### III. MOTION TO SUPPRESS

In issues four and five, appellant contends the trial court erred in denying his motion to suppress the second part of his videotaped statement because officers failed to re-warn him in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.

13

Ct. 1602, 16 L. Ed. 2d 694 (1966), and article 38.22 of the Texas Code of Criminal Procedure. Appellant's written motion to suppress did not raise the issue presented on appeal. The record of the hearing on appellant's motion to suppress reflects the issue was not raised at that time either. Rather, counsel stated to the trial court, "I just want to put in the record that I'm adopting the arguments made in my motion to suppress. That is my argument. I don't think I need to read it to you or re-argue it. But those are my arguments and with that we rest." However, during Officer Duplechain's testimony at trial, counsel objected that the second part of the interview should be suppressed because appellant was not re-warned after a five-hour gap. The trial court overruled the objection and admitted the evidence.

When reviewing a trial court's decision on a motion to suppress regarding a custodial interrogation, we must conduct a bifurcated review. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We afford almost total deference to the trial court's rulings on questions of historical fact and credibility, and review de novo only the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor. *Id.* The evidence presented on a motion to suppress is viewed in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We will affirm the trial court's ruling if it is correct under any theory of law applicable to the case. *Id*. at 855–56.

The trial court entered written findings of fact and conclusions of law regarding appellant's motion to suppress. As pertinent to the failure to re-warn, they are as follows:

### FINDINGS OF FACT

. . .

23. The recorded statement lasts approximately 7 hours, (from approximately 4:30 p.m. until approximately 11:30 p.m.) There is a

14

break during the recorded interview where Officer Duplechain leaves the room to check on some of the information the Defendant had provided and to check information being provided to other officers by other witnesses.

24. The Court finds that Officer Duplechain did not rewarn the Defendant when he returned to interview him at 10:30 p.m. on February 20, 2013.

25. The nature of the questioning during the first and second portions of the approximate 7 hour recorded interview make it clear that the second portion of the interview is merely a continuation of the first interview.

26. The Court finds that the Defendant's statement ended at 11:30 p.m. when the Defendant stated he did not want to discuss the case any longer and wished to speak to an attorney.

27. The Court finds based on the totality of circumstances, that although there was a break in the interview to ascertain other developing information, the second portion of the defendant's statement was related to the same offense and merely a continuation of the first portion of the statement and that the entire seven hours of the recorded statement is one continuous interview.

28. It is clear from the video and audio recordings of the Defendant's interview that he was competent to waive his rights and that he understood the nature of the interviews and the seriousness of the offense. The Defendant asks his own questions of the Officer. The Court finds that the Defendant was competent and fully aware of what was occurring.

29. The Court finds that the Defendant evidenced his understanding of his rights and waiver thereof by affirmatively waiving each of the rights on the recording and by in fact invoking his right to an attorney at the end of the approximately 7 hour interview.

## CONCLUSIONS OF LAW

. . .

12. The statutory *Miranda* warnings given during the first portion of the Defendant's recorded interview remained effective in the subsequent second portion of the recorded interview.

13. The Court finds that the mere passage of time did not transform the

15

second portion of the recorded interview into a separate interview and that new statutory *Miranda* warnings were not necessary.

The record reflects that Officer Duplechain gave appellant the *Miranda* warnings at approximately 4:30 p.m. Duplechain left the interview at approximately 5:15 p.m. At 6:42 p.m., Officer Stahlin entered the room, exiting three minutes later. During the time Duplechain was gone, Sergeant Elliott also entered the room. Duplechain returned around 10:35 p.m. At approximately 11:30 p.m., appellant invoked his right to an attorney and Duplechain immediately concluded the interview. Appellant's claim is that the *Miranda* warnings had to be given before questioning resumed after the five-hour lapse.

We first note that the mere passage of time does not automatically vitiate the prior warnings. *See Jones v. State,* 119 S.W.3d 766, 773–74 n. 13 (Tex. Crim. App. 2003); *Ex parte Bagley,* 509 S.W.2d 332, 337–38 (Tex. Crim. App. 1974). In addition, we are to consider whether the second interrogation was conducted by a different person; the second interrogation related to a different offense, and if the officer ever asked if he remembered those warnings or wished to waive or invoke them. *Jones,* 119 S.W.3d at 773–74 n. 13.

In *Bagley*, the assistant district attorney warned the defendant before he made the first statement. 509 S.W.2d at 335. Subsequently, the defendant gave a second statement to the same assistant district attorney. *Id.* at 336–37. The defendant in *Bagley* was warned before the second statement. *Id.* The Court determined the second warnings were sufficient but also concluded the warnings given six to eight hours earlier, during the defendant's first statement, satisfied *Miranda's* requirements as to the second statement. *Bagley*, 509 S.W.2d at 337.

Similarly, in *Miller* there was a lapse of four days between the time *Miranda* warnings were given and the statement in question was made, without additional

16

warnings. *Miller v. State*, 196 S.W.3d 256, 266 (Tex. App.—Fort Worth 2006, pet. ref'd). The court determined the failure to warn the defendant again did not violate *Miranda* where the defendant met with the officer who had given him the warnings on both occasions and the questioning dealt with the same subject on each occasion. *Id.* at 266-67.

In *Jones*, the defendant was warned before the first statement was given but was not warned again before giving a second statement nine or ten days later. 119 S.W.3d at 771. The Court found the defendant's *Miranda* rights were violated. *Id.* at 774. However, the Court recognized it was not simply the passage of time between the two statements but the additional facts that the two interrogations were not by the same officer or about the same offense. *Id.* at 774 n.13.

Appellant relies upon *Franks* in support of his argument. *See Franks v. State*, 712 S.W.2d 858, 861 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). In that case, the defendant was warned at the beginning of the first custodial interrogation at 11:53 a.m. *Id.* At 12:30 p.m., officers stopped the interrogation to talk with other witnesses. *Id.* The interrogation continued at 4:02 p.m. and ended at 4:23 p.m. *Id.* The defendant was not warned again at 4:02 p.m. but was asked, and acknowledged, that he had been advised of his *Miranda* rights earlier. The court determined the statement was admissible. Appellant contends the fact that the defendant was reminded of the earlier warnings "was critical" to the court's decision. We disagree.

The *Franks* court held "the second phase of the interrogation was merely a continuation of the interrogation process, and that under the circumstances presented, there was not such a "break" in the interrogation proceeding as to require the giving of new warnings. The [defendant] was properly admonished at the beginning of the interrogation, and at the time the second phase of the interrogation

started, he acknowledged that he had been advised of his *Miranda* rights." *Franks,* 712 S.W.2d at 861. We cannot agree that this holding was dependent upon the defendant having been reminded of his rights. The court's holding is based first upon the fact there was no "break" that required additional warnings and second that proper admonishments were initially given. *Id.* While the reminder of the warnings is a factor to be considered, *see Jones,* 119 S.W.3d at 773–74 n. 13, its absence is not dispositive.

Likewise, a reminder of earlier warnings was one of the circumstances in *Bible* supporting that two interrogation sessions were part of a single interview for *Miranda* purposes. *Bible v. State*, 162 S.W.3d 234, 242 (Tex. Crim. App. 2005). In that case, the lapse between sessions was three hours. The Court noted that "[a]lthough different officers conducted questioning during each session and each session focused on a different set of crimes, the same officers were present during both sessions." *Id.* The Court then recognized that an officer reminded defendant of his earlier waiver of rights; secured his acknowledgment that he had previously been given warnings; briefly reminded him of his rights; and secured his assent to continue. *Id.* Thus the *Bible* court did not rely solely upon the reminder; it was one of the circumstances establishing *Miranda* was satisfied. *Id.*

Appellant also asserts a lack of sleep is a relevant consideration when determining the voluntariness of a defendant's waiver and points to the fact that he fell asleep in the interview room and had to be awakened by Duplechain at 10:30 p.m. The videotape reveals appellant was also asleep before Duplechain entered the room the first time. This court has recognized that lack of sleep is a circumstance to consider in determining whether a statement was made voluntarily. *Martinez v. State*, 513 S.W.3d 87, 93 (Tex. App.—Houston [14th Dist.] 2016, no pet.). However, lack of sleep alone will not render a defendant's confession involuntary. *Barney v.*

*State,* 698 S.W.2d 114, 121 (Tex. Crim. App. 1985). Appellant did not complain of being tired or needing to rest. *See Hernandez v. State*, 421 S.W.3d 712, 718 (Tex. App.—Amarillo 2014, pet. ref'd) (concluding record did not indicate defendant's inculpatory statements were influenced by fatigue even though interrogation was the defendant's third in 48 hours and began at 11:00 p.m. when defendant did not complain of tiredness); *see also Chambers v. State,* 866 S.W.2d 9, 20 (Tex. Crim. App. 1993) (lack of sleep through the fault of the defendant will not support a finding of involuntariness). The record does not reflect appellant was intentionally deprived of sleep. *See Rodriquez v. State*, 934 S.W.2d 881, 890 (Tex. App.—Waco 1996, no pet.) (concluding that officers' knowledge defendant claimed to have been awake for at least 36 straight hours did not establish he was purposefully deprived of sleep).

In this case the lapse of time between the two statements was approximately five hours. Both the first and second parts of the interview were conducted by the same officer and that officer gave appellant proper *Miranda* warnings before the interview began. The record reflects that during the first part of the interview Duplechain was attempting to determine appellant's whereabouts on the day in question. Duplechain left the interview to verify appellant's claims stating, "I'll be back in a little while, allright?" When Stahlin entered the room, he asked appellant his name, birthdate, age, address, phone number, height and weight and requested the name, phone number and address of the person that appellant said owned the white car that he had been driving. At some point while Duplechain was absent, Elliott entered and took appellant out of the room, briefly, to photograph him. When Duplechain returned, the interview continued and Duplechain discussed his findings with appellant. Thus, the record does not demonstrate that appellant was interrogated about different offenses in the two parts of the interview. Further, it does not show that appellant was interrogated about the offense by different officers.

19

Furthermore, the record in this case reflects that appellant was well aware of his rights, as he invoked those rights within one hour of the continuation of the interview. The record supports the trial court's findings and conclusions. In light of all the circumstances discussed above, we conclude the trial court did not abuse its discretion in overruling appellant's objection to the admission of the second part of his statement. *Bagley*, 509 S.W.2d at 337. Accordingly, appellant's fourth and fifth issues are overruled.

## IV. JURY CHARGE

In his next two issues, appellant claims there was error in the court's charge to the jury. In his sixth issue appellant argues the trial court erred in refusing to include his requested jury charge on whether his videotaped statement comported with article 38.22. *See* Tex. Code Crim. Proc. art. 38.22 §§ 2(a) and 3(a)(2).

When we review a claim of jury-charge error, we first determine whether there is error in the charge. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). "[W]e review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal." *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). Error that has been properly preserved must be reversed unless it is harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Error that has not been properly preserved is reversible only if it was so serious that the defendant did not have a "fair and impartial trial." *Id*. In other words, if a defendant has preserved his claim of jury-charge error, we must reverse if the defendant suffered "some harm" to his rights, but if the defendant has not preserved his claim, we must reverse only if the defendant suffered "egregious harm." *Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171.

20

The record reflects appellant requested a more detailed voluntariness instruction than the one contained in the trial court's charge. In his brief, appellant identifies only the alleged failure to re-warn him at 10:30 p.m. as grounds for such an instruction. Accordingly, that is the only ground we address.

Section 7 of article 38.22 provides that "[w]hen the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." Tex. Code Crim. Proc. art. 38.22, § 7. "The issue" refers to compliance with the statutory warnings set out in sections 2 and 3 of article 38.22, and the voluntariness of the defendant's waiver of rights. *Oursbourn v. State*, 259 S.W.3d 159, 176 (Tex. Crim. App. 2008); *see also Aldaba v. State*, 382 S.W.3d 424, 430 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); Tex. Code Crim. Proc. art. 38.22 §§ 2, 3 (incorporating requirements of *Miranda*). For the issue to be "raised by the evidence," there must be a genuine factual dispute. *Oursbourn*, 259 S.W.3d at 176; *Aldaba*, 382 S.W.3d at 430. We review the trial court's refusal to submit such an instruction in the jury charge for abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).

Here, there was no factual dispute raised by the evidence as contemplated by section 7 and appellant does not assert otherwise. Although appellant argued the latter part of his videotaped interview was a second interrogation that required additional warnings, the fact that the interview ceased and then resumed at 10:30 p.m. with no additional warnings given was never in dispute. *See Brownlee v. State*, 944 S.W.2d 463, 467, 468 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (concluding issue of section 7 voluntariness was not raised by defendant's testimony explaining the reason he talked to the police."). Because no factual dispute was raised by the evidence to warrant an instruction under section 7, the trial court did

not err in refusing the requested instruction. We therefore overrule appellant's sixth issue.

Appellant further asserts in his seventh issue that the trial court erred by failing to sua sponte include an article 38.23 due process instruction because the second part of his videotaped statement was taken at a time when he was in need of sleep. Appellant claims the police "exploited his sleepy condition" as evidenced by the fact that he slept in the interrogation room and was awakened by Officer Duplechain at 10:30 p.m.

The trial court has a duty to give an article 38.23 instruction sua sponte if three requirements are met: (1) evidence heard by the jury raises an issue of fact, (2) the evidence on that fact is affirmatively contested, and (3) that contested factual issue is material to the lawfulness of the challenged conduct in obtaining the evidence. *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010). There must be a genuine dispute about a material issue of fact before an article 38.23 instruction is warranted; if there is no disputed fact issue, the legality of the conduct is determined by the court alone, as a matter of law. *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007). For there to be a conflict in the evidence that raises a disputed fact issue, there must be some affirmative evidence in the record that puts the existence of that fact in question. *Id.* at 513.

In the instant case, there was no contested question of fact – it was never disputed that appellant was asleep before his videotaped interview resumed. The mere fact that appellant was asleep does not, without more, raise a disputed fact issue as to whether he was "sufficiently awake to be interviewed." *See Contreras v. State,* 312 S.W.3d 566, 576 (Tex. Crim. App. 2010) (in rejecting defendant's contention that he was entitled to a jury instruction that lack of sleep, by itself, rendered his confession involuntary, the court concluded "that a lack of sleep would not, by itself,

render a confession involuntary under due process"). Appellant does not refer this court to any evidence raising a disputed fact issue that would warrant an instruction under article 38.23. *See Jackson v. State*, 468 S.W.3d 189, 199-200 (Tex. App.— Houston [14th Dist.] 2015, no pet.) (holding defendant was not entitled to an article 38.23 instruction where there was no disputed fact issue on whether there was a reasonable alternative to impoundment). Accordingly, we overrule appellant's seventh issue.

## V.    CLOSING ARGUMENT

In appellant's final issue he asserts that he was denied effective assistance of counsel when the trial court instructed counsel not to argue that the five-hour span between the first and second part of his videotaped statement rendered the second part involuntary for the purpose of the general voluntariness instruction given by the trial court pursuant to article 38.22, section 6. *See* Tex. Code Crim. Proc. art. 38.22 § 6. We first note that although appellant presents this as a claim of ineffective assistance, it is, in fact, a claim that the trial court erred in instructing counsel that he would not be allowed to make such an argument.

Proper jury argument encompasses a summation of the evidence presented at trial and reasonable deductions from that evidence. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). Additionally, argument must be limited to the proper scope of jury deliberation as defined by the court's charge. *Barragan v. State*, 641 S.W.2d 380, 382 (Tex. App.—El Paso 1982, no pet.). Having found above that the trial court did not err in finding additional warnings were not required when the videotaped interview resumed at 10:30 p.m., and that the trial court did not err in its instructions to the jury, we cannot say the trial court's restriction on argument was erroneous. *See id.* Appellant's eighth issue is overruled.

## VI. CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/     John Donovan
Justice

Panel consists of Chief Justice Frost and Justices Christopher and Donovan.
Do Not Publish — Tex. R. App. P. 47.2(b).