Paul Salcedo **RODRIQUEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 10–95–253–CR.

Court of Appeals of Texas, Waco.

Nov. 20, 1996.

882

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, Criminal District Attorney, Mark E. Parker, Asst. District Attorney, Mike Freeman, Asst. District Attorney, Waco, for appellee.

———

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

A jury found the appellant, Paul Salcedo Rodriquez, guilty of voluntary manslaughter and assessed punishment at 17 years' incarceration in the Texas Department of Criminal Justice—Institutional Division and a $10,-000 fine. TEX. PENAL CODE ANN. § 19.04 (Vernon 1994). Rodriquez brings two points on appeal: (1) the trial court erred in limiting his impeachment of one of the State's witnesses, and (2) the trial court erred in admitting his confession into evidence. We affirm.

Rodriquez complains in his first point that the trial court erred in limiting his impeachment of one of the State's witnesses, Walter Garris. Garris testified on direct that Rodriquez told him, while they were both confined in the McLennan County Jail, that he "beat up" the victim, Rodriquez's roommate, on the night of the offense because the roommate would not go purchase crack cocaine with him, and he killed the victim so that he would not tell anyone about the beating.[1] Pursuant to questioning on direct from the State, Garris admitted that, when he notified the McLennan County District Attorney's Office about his alleged conversation with Rodriquez, he was being held in the county jail on allegations that he, on one occasion in August 1994, had possessed marijuana, methamphetamines and illegal knives.

On cross-examination, Rodriquez attacked the credibility of Garris' statements by asking him to relate the facts of the August 1994 incident. Garris testified that he and his wife were pulled over in Beverly Hills, Texas, on the night of the offense ostensibly because one of the headlights on his automobile was not working properly. He recounted that at the time of his arrest, a pouch containing methamphetamines was found thirty feet behind his car. He stated that two marijuana "roaches" were found in his pants pocket and that a box of knives was discovered in the trunk of his car. Garris also related that he knew if he were convicted of the August 1994 charges he faced a habitual offender sentence because he had been convicted of several felonies in the past. After Garris informed the District Attorney's Office about the conversation, the office decided not to seek an indictment, and Garris was released from jail. Garris testified that the District Attorney's Office decided not to prosecute him because it lacked sufficient evidence to obtain a conviction.

In an effort to attack the veracity of Garris' testimony on cross-examination, Rodriquez wanted to call two police officers from the Beverly Hills Police Department who were privy to information concerning Garris' August 1994 arrest. Officer Steve Soto was one of the law enforcement officials who arrested Garris for the August 1994 incident, and Officer James Hill was the custodian of records for the Beverly Hills Police Department. In a hearing outside the presence of the jury, Rodriquez informed the trial court that he wanted to call Officer Soto for two reasons: (1) to further show that Garris' motive for testifying was the hope of receiving a lighter sentence or a dismissal of the August 1994 charges and (2) to demonstrate to the jury that the State's case, according to Officer Soto's recollection of the events, was actually much stronger than Garris had indicated.[2] Rodriquez wanted to show that Garris' charges were dismissed the same day he signed his statement incriminating Rodriquez.[3] Rodriquez made an offer of proof of the proposed testimony from Officers Soto and Hill.

---

1. Garris stated that Rodriquez claimed he killed the victim by "kick[ing] him to sleep."

2. Officer Soto's recollection of the events differed from Garris' in two regards: first, he stated that the pouch of methamphetamines was found, not on the ground, but on his patrol car's door after Garris and his wife were inside the car; and second, Officer Soto stated that the marijuana was recovered from Garris' wife's leather jacket, not in Garris' pants pocket.

3. Rodriquez argued to the trial court that he would offer testimony from another Beverly Hills Police Officer who was also involved in Garris' August 1994 arrest. No offer of proof, however, was made of the testimony he would provide. Therefore, we have no way on knowing what he actually would have said, notwithstanding counsel's arguments to the trial court in the record. See TEX.R.CRIM. EVID. 103(a)(2).

■ "The practice of exposing a witness' motivation to testify against a defendant is a proper and important function of the constitutionally protected right of cross-examination." *Miller v. State*, 741 S.W.2d 382, 389 (Tex.Crim.App.1987) (internal quotation omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988). "Accordingly, eliciting an admission that the witness has been accused of or incarcerated for a crime may be pertinent to show that his 'testimony was biased because given under promise *or* expectation of immunity, *or* under the coercive effect of his detention by officers of [government who are] conducting the present prosecution. * * * Even if the witness were charged with some other offense ..., [a defendant would be] entitled to show by cross examination that his testimony was affected by fear *or* favor growing out of his detention.'" *Harris v. State*, 642 S.W.2d 471, 476 (Tex.Crim.App.1982) (quoting *Alford v. United States*, 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)) (internal citations omitted, edits and emphasis by *Harris* court), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *see Carroll v. State*, 916 S.W.2d 494, 499, 500 (Tex.Crim. App.1996).

■ The defendant's right to impeach the witness does not stop with the right to cross-examine him. If on cross-examination the witness "denies anything that would show a motive for, or animus to, testify against a party, [such] may be shown by other witnesses and by independent facts." *Jackson v. State*, 482 S.W.2d 864, 867 (Tex. Crim.App.1972).[4] The right of the defendant to cross-examine the witness, or impeach him with extrinsic evidence, is limited by the trial court's authority to preclude, among other things, confusion of the issues, harassment, endangerment to the witness, needless delay, and the admissibility of highly prejudicial, repetitive and irrelevant or marginally relevant evidence. *See Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *Carroll*, 916 S.W.2d at 499; *Love v. State*, 861 S.W.2d 899, 904 n. 9 (Tex.Crim.App.1993); *Hurd v. State*, 725 S.W.2d 249, 252 (Tex.Crim.App.1987). The trial court's discretion in this regard, however, is not unlimited. *See Hurd*, 725 S.W.2d at 252. For instance, the court may not restrict the defendant to only one method of demonstrating bias, and it may not preclude the defendant from engaging in an otherwise appropriate means of impeachment "designed to show a prototypical form of bias on the part of the witness." *Id.* (quoting *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436). Essentially speaking, the trial court may not exercise its discretion in a manner that frustrates the defendant's Sixth Amendment right to confront and cross-examine his witnesses. *See* U.S. CONST. amend. VI, XIV.

■ We conclude that the trial court properly exercised its discretion in preventing Rodriquez from calling Officers Soto and Hill as witnesses. *See Chambers v. State*, 866 S.W.2d 9, 27 (Tex.Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994); *Hanley v. State*, 921 S.W.2d 904, 909 (Tex.App.—Waco 1996, pet. ref'd).

During the offer of proof, the State suggested in its questioning of Officer Soto that one of the reasons the charges were dismissed was that the police officer who did stop Garris did not have probable cause to do so.[5] Officer Soto testified that he was called

---

**4.** The State argues that the trial court properly limited Rodriquez's efforts to impeach Garris because the inquiry delved into specific instances of conduct in violation of TEX.R.CRIM. EVID. 608(b). The Court of Criminal Appeals in *Carroll v. State*, however, drew a distinction between the right to confrontation and the trial court's authority under Rule 608(b). 916 S.W.2d 494, 500–01 (Tex. Crim.App.1996). If the defendant is exploring the witness' bias or possible bias, then the defendant is exercising his constitutional rights to confront his witnesses under the Sixth Amendment and any violation of Rule 608(b) would be incon-sequentially incidental. *Id.* at 500. The Court noted that, while it saw no conflict between the right to confrontation and Rule 608(b), should a conflict arise the constitutional provisions would obviously supersede anything written in the Rules of Criminal Evidence. *Id.* at 501.

**5.** The record reveals that the prosecutor who decided to dismiss Garris' charges was at the time of trial no longer employed by the District Attorney's Office and had moved to El Paso to prosecute in federal court.

to the scene a short time after the stop to provide back-up assistance. When asked by Rodriquez's counsel if he knew why Garris' automobile was stopped that night, Officer Soto responded that he was not certain because he did not make the stop. He also did not know if a traffic citation was issued. Rodriquez did not present any evidence from anyone who was involved in the stop. Without any evidence concerning the legality of the initial stop, Rodriquez's argument that the evidence seized could have been used against Garris at trial was speculative.

· Concerning the drugs that were found, Officer Soto was unable to affirmatively link them to Garris. He stated that the methamphetamines were found in his patrol car "on the side of [his] door" after both Garris and his wife were placed in the car. However, he offered no additional testimony either that Garris alone possessed the methamphetamines or that Garris and his wife jointly possessed it. Officer Soto further related that the marijuana was found not on Garris, but in Garris' wife's jacket. With regard to the knives, Officer Soto testified that they were found in the trunk of the automobile and, therefore, Garris had not violated the law because the knives were not on his person.

When Garris testified about the August 1994 incident, the story he related depicted a weak State's case. Officer Soto, while contradicting some segments of Garris' story, similarly depicted a weak State's case.[6] The net result of Officer Soto's testimony would have been only marginally supportive of Rodriquez's theory that Garris fabricated Rodriquez's jail-house confession to avoid being convicted of the August 1994 charges. By allowing evidence of the facts surrounding the August 1994 offense, the court could have believed that the jurors would have confused the issues on trial. With Officer Soto's testimony only slightly contradicting Garris' version of the events, there was little justifica-

tion for diverting the jury's attention away from the real issue at trial, Rodriquez's guilt or innocence. The trial court was well within its discretion, or the "zone of reasonable disagreement," in determining that the testimony from Officer Soto needed to be excluded. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (on rehearing). Furthermore, a great amount of time would have been consumed, for a minimal benefit, in presenting the facts of Garris' August 1994 arrest. Grappling with legal issues such as whether reasonable suspicion existed to stop Garris' automobile that night and whether a person may be considered to possess an illegal knife if the knife is in his trunk would have consumed even more of the judge's, the attorneys', and the jury's valuable time.

Finally, Officer Hill's testimony was unnecessarily repetitive. Garris admitted that he informed the District Attorney's Office about Rodriquez's statements while Garris was still in jail and before his charges were dismissed. He further stated that the charges were dismissed shortly thereafter. Officer Hill would have been able to add little to the impeaching nature of this testimony. Therefore, we conclude that the trial court acted within its discretion in precluding Rodriquez from impeaching Garris' motive for testifying against him with testimony from Officer Soto and Officer Hill. *See DuBose v. State*, 915 S.W.2d 493, 497–98 (Tex.Crim.App.1996). Rodriquez's first point is overruled.

Rodriquez argues in his second point that his confession should not have been admitted into evidence because, even though he voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it was unlawfully obtained through the use of unduly coercive interrogation techniques by Waco law enforcement officials. In particular, he contends these officials deprived him of sleep, badgered him with repeated accusations that his recountings of the events preceding and

---

**6.** We note that Rodriquez only argues that his Sixth Amendment right to confront Garris about his motive for testifying against him was violated. Rodriquez makes no claim that he was denied an opportunity to impeach Garris' credibility under Tex.R.Crim. Evid. 607 by showing that Officer Soto's testimony contradicted Garris'. There-

fore, we are not interested in any discrepancies between Garris' and Officer Soto's respective versions of the events for the sake of showing that Garris may have lied. Instead, we are only concerned with the strength of Garris' motivation to lie under Officer Soto's version of the events.

including the victim's assault were deliberate falsehoods, took advantage of his state of inebriation to persuade him to confess, and tricked him by falsely claiming that the victim implicated the defendant on his deathbed and that these "dying declarations" would be admissible at trial.

To be admissible, a confession must be voluntarily given and obtained in compliance with *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. *Penry v. State*, 903 S.W.2d 715, 749 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); *Green v. State*, 839 S.W.2d 935, 940 (Tex.App.—Waco 1992, pet. ref'd). The State bears the burden of proving by a preponderance of the evidence that the statement was not involuntarily given and therefore inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App.1995). "A statement is 'involuntary,' for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado*, 912 S.W.2d at 211; *see Connelly*, 479 U.S. at 164, 107 S.Ct. at 520. In determining admissibility, the trial court is the sole judge of the weight and credibility of the evidence, and its findings will not be disturbed on appeal absent an abuse of discretion. *Alvarado*, 912 S.W.2d at 211. The court will review the totality of the circumstances surrounding the giving of the statement in making its decision. *Clewis v. Texas*, 386 U.S. 707, 708, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423 (1967); *Barney v. State*, 698 S.W.2d 114, 120 (Tex.Crim.App.1985).

In the instant case, the trial court held a *Jackson–Denno* suppression hearing before trial wherein Rodriquez and five Waco law enforcement officials offered testimony on the facts relating to the admissibility of Rodriquez's statement. TEX.CRIM. PROC.CODE ANN. art. 38.22, § 6 (Vernon 1979); TEX. R.CRIM. EVID. 104(c); *see Jackson v. Denno*, 378 U.S. 368, 380, 84 S.Ct. 1774, 1783, 12 L.Ed.2d 908 (1964). At the conclusion of the hearing, the court determined that Rodriquez made his statement voluntarily and that it was, therefore, admissible. Later, at trial, further testimony was adduced from these same five law enforcement officials concerning the voluntariness of the confession. Rodriquez, deciding not to take the witness stand in front of the jury, offered no additional testimony. When the State then attempted to introduce the confession into evidence at trial, Rodriquez renewed his objection, which the trial court again overruled.

Officer Joe Neal testified, both at the suppression hearing and at trial, that he arrived at the crime scene around 3:15 a.m. on January 28, 1994. In the approximately sixty minutes after his arrival, Officer Neal spoke intermittently to Rodriquez as Officer Neal walked around the outside of the premises looking for evidence. During that hour, Rodriquez gave conflicting accounts of the events leading to and including the assault. Initially, Rodriquez blamed a group of people who wanted to buy cocaine from the victim for the offense. He then gave conflicting accounts of the number of people in the group and the group's racial composition. Another inconsistency in his statements involved Rodriquez indicating to the officers two different directions in which he ran to call for emergency medical assistance. A third inconsistency involved Rodriquez stating at one point that he telephoned for emergency medical assistance immediately after the victim was assaulted, and then later stating that he only discovered that the victim had been assaulted when he noticed that he had not come back inside after leaving the house approximately 45 minutes earlier.

Officer Neal testified that when he arrived at the scene Rodriquez appeared intoxicated, smelled strongly of alcohol, was probably too drunk to drive and that there was a number of empty beer cans in the yard. He, however, also stated that Rodriquez seemed to answer his questions responsively, although he administered no test to determine whether he was in fact intoxicated. He testified that at around 4:10 a.m., pursuant to an order from Sergeant J.R. Price, he read Rodriquez the statutory *Miranda* warnings. About one-half hour later, again pursuant to an order from Sergeant Price, Officer Neal

transported Rodriquez to the police station, arriving at around 5:00 a.m. He could not recall whether he spoke to him on the way to the police station. Officer Neal claimed that Rodriquez was not under arrest at this time and that he agreed to go to the station on his own volition. According to Officer Neal, Rodriquez rode unhandcuffed in the back of his patrol car, which he was unable to exit without someone opening the door from the outside. Officer Neal stated that Rodriquez was free to leave at any time.

Detective Mike Alston testified that he arrived at the scene around 3:50 a.m. and that he witnessed Officer Neal read Rodriquez the statutory *Miranda* warnings at the scene. He related that Rodriquez appeared to have been drinking because his eyes were "a little bloodshot" and he smelled of alcohol. He, however, stated that Rodriquez was cooperative and able to communicate with him and the several other officers present. He stated that several officers at the scene questioned Rodriquez in his living room before he was brought to the police station. He further stated that he, personally, again read the warnings to Rodriquez at the police station in the interview room shortly after 6:00 a.m. He testified that he offered Rodriquez both food and drink at the police station, but the offers were declined. He stated that Rodriquez made no requests for sleep, food or drink. He then proceeded to question Rodriquez for approximately two hours, during which time, according to Detective Alston, Rodriquez was free to leave whenever he wished. He related that the door was intermittently opened and closed during the questioning. Rodriquez was given no breaks, but neither did he ask for any. Detective Alston testified that much of the interrogation, probably the final three-fourths of it, consisted of him telling Rodriquez that his explanation of the events was simply unbelievable. During the interrogation, he repeatedly accused Rodriquez of being the assailant and expressed his opinion that Rodriquez was lying. Detective Alston also admitted that he told Rodriquez during the interrogation that the victim, on his deathbed, repeated several times, "Why you, Paul?", when in fact the victim never regained consciousness after the police arrived

at the scene. He told Rodriquez that these "dying declarations" would be admissible at trial. Detective Alston ended the interrogation session to make a court-appearance in an unrelated matter.

Sergeant Jerry Wilson testified that he was a detective at the time of the offense and that he interrogated Rodriquez at the police station, by himself, on January 28 starting sometime between 8:00 and 9:00 a.m. and lasting until approximately 1:00 p.m., when Rodriquez gave his statement. Before asking any questions, Sergeant Wilson testified that he apprised Rodriquez once again of the statutory *Miranda* warnings and that Rodriquez freely waived those rights. He testified that during the interrogation he informed Rodriquez that he was not under arrest and that he could leave the police station if he wanted to. He indicated that Rodriquez never asked for an attorney and never asked that the interrogation stop. Sergeant Wilson related that he neither promised Rodriquez anything nor denied him food, drink or restroom access. He explained that food, drink and restroom breaks were offered to him, but he declined the offers. He maintained that Rodriquez seemed "slightly and fairly" intoxicated because he smelled of alcohol and his speech was slow, although not slurred. Sergeant Wilson also stated that Rodriquez appeared alert, aware of his surroundings, cognizant that he was being questioned about the offense, and that he was no longer, or perhaps only slightly, intoxicated when he finally made his statement. He stated that during the first two hours of the interrogation Rodriquez spoke progressively more and more freely and eventually admitted to not being completely truthful with the other officers to whom he had spoken. He then retold his version of the events, and Sergeant Wilson transcribed it onto paper. Also on the paper, Rodriquez once again acknowledged that he had been apprised of his statutory *Miranda* warnings and that he voluntarily waived his rights. Sergeant Wilson maintained that he intended to continue with the interrogation until Rodriquez either confessed, gave what he considered a plausible explanation of the events, or requested that the interview stop. He also stated that Offi-

cer Robert Fuller and Officer Charles Jaquith personally witnessed the statement.

Officers Fuller and Jaquith testified that they were called to the interview room to witness Rodriquez's confession. They related that the entire statement was read back to Rodriquez and that he was given an opportunity to make any corrections that he wished. Rodriquez did not appear intoxicated to Officer Fuller at the time. Officer Jaquith testified that Rodriquez was again apprised of his rights at the time he made the statement.

At the suppression hearing, Rodriquez testified that on the day before the assault he went to work at 3:00 p.m. and worked two straight eight-hour shifts, leaving work finally at 7:00 a.m. the next day. Upon returning home, he did not go to sleep; instead, he opted to perform some cleaning chores and consume alcohol. Rodriquez testified that he drank over eighteen beers from the time he returned home until Waco police officers arrived to investigate the assault.

When the officers arrived, whom Rodriquez could not identify by name, they questioned him for two to three hours before transporting him to the police station in a patrol car. When asked whether the officers inquired if they could take him down to police station, Rodriquez answered, "Yeah, they told me that they were going to take me there to question me more on this case that they had." He could not recall if he was handcuffed.

Upon arrival at the station, the questioning recommenced immediately and continued, according to Rodriquez, for fourteen hours.[7] He testified that there were two detectives who questioned him constantly during that time, but he could not recall who they were, or even whether they were the same officers who had questioned him at his home. He testified that he did not feel free to leave because of the persistency of the questioning and the officers' repeated attempts to persuade him to give details of the offense when he had previously claimed ignorance about

them. He stated that one of the officers became angry and told him several times that he was lying. He related that, for awhile, he felt as if the questioning would never stop. He testified that he finally gave the statement because he was exhausted, felt like he was going to pass out, and believed the questioning would cease only if he confessed to killing the victim. Rodriquez stated that he had been awake for more than eighteen hours when he gave his confession.

On cross-examination, Rodriquez testified that the officers read him his rights and that he understood his rights. He further testified that he voluntarily waived those rights. He related that the officers told him that he "didn't have to make a statement." He stated that he never informed the officers that he wanted to go home or that he wanted the questioning to stop or that he wanted an attorney, although he did tell them that he was tired. He stated the questioning both at his home and at the police station took about nine hours.[8]

## ACCUSATIONS OF LYING

 The record does not support Rodriquez's claim that the officers' repeated accusations that he was lying forced him to give his confession involuntarily. Rodriquez, himself, testified that he was informed that he could end the interview anytime that he wanted. Several of the officers related that they would have ended the interview if Rodriquez had requested it, but he never did. Rodriquez explained that he believed the questioning would never end until he confessed to the killing, but nothing in the record indicates that the officers did anything to make Rodriquez think that. The due process requirement that a confession must be made voluntarily to be admissible is geared toward preventing coercive interrogation tactics. *Connelly*, 479 U.S. at 163–64, 107 S.Ct. at 520. Absent police conduct causally related to the confession, there is simply no basis for concluding that the officers deprived the suspect of the due process of law. *Id.* 479 U.S. at 164, 107 S.Ct. at 520. The subjective intent of the accused can be relevant to the

---

7. We recognize that Rodriquez's accounting of the length of the interview does not correspond with that of the several officers who testified.

8. We recognize the discrepancy in Rodriquez's tallying of the length of the questioning.

determination of voluntariness, but only if the interrogating officers take advantage of it to "wring[ ] a confession out of [the] accused against his will." *Id.* Here, the court found that the officers did not take advantage of Rodriquez's subjective belief that he was not free to leave to coerce a confession. Rodriquez was repeatedly informed by several police officers at various stages of the interrogation process that he could end the interview whenever he wanted. Rodriquez told the officers that he understood that right, and he admitted at the *Jackson–Denno* hearing that he knew that he possessed that right. The record indicates that the officers did not know that Rodriquez did not think he could leave. Without being aware that Rodriquez subjectively thought that he was not free to leave, the officers obviously could not have manipulated this belief to unlawfully extract a confession from him. A reasonable person in Rodriquez's position should have known that he could have stopped the accusations by stopping the interview. Rodriquez cannot complain that his will was overborne by the officers' repeated accusations when he easily could have stopped the interview himself. By being persistent in their questioning of him, it could be said that the officers necessarily led Rodriquez to believe that they wanted to continue with the interview and not stop it. But this minimal level of coercion comes nowhere near the level of coercion necessary to violate a suspect's due process rights.

## DEPRIVATION OF SLEEP

 Neither does the record support Rodriquez's argument that the officers deprived him of sleep. There was evidence that the officers knew that he claimed to have been awake for at least 36 straight hours when the officers arrived at his home, but there is no evidence in the record that Rodriquez ever informed the officers that he was sleepy or that he wanted to go to sleep. He may have told them that he was tired, but he should then have told them that he wanted to rest. Rodriquez has failed to demonstrate that the police coerced his confession by purposefully depriving him of sleep. *See*

*Chambers*, 866 S.W.2d at 20 (lack of sleep through the fault of the defendant will not support a finding of involuntariness); *see also Johnson v. State*, 698 S.W.2d 154, 159 (Tex.Crim.App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *Barney*, 698 S.W.2d at 121.

## INTOXICATION

 There was evidence in the record that, at the time the police arrived at the crime scene, Rodriquez had consumed more than eighteen beers over the course of approximately twenty hours. The officers who witnessed Rodriquez at the scene and then when he arrived at the police station testified that he appeared intoxicated but also that he was aware of what he was saying, knew what the officers were saying and was responsive to their questions. *Alvarado*, 912 S.W.2d at 210–11. Moreover, there was testimony from Sergeant Wilson that, by the time he finally gave his statement, Rodriquez was at the most only slightly affected by the alcohol he had consumed. Officer Fuller, who witnessed the statement, stated that Rodriquez did not appear intoxicated at all at the time. *See Garcia v. State*, 919 S.W.2d 370, 387 (Tex.Crim.App.1996) (on rehearing). While Rodriquez testified that he consumed a lot of beer, he never stated that the alcohol impeded his mental faculties at any time during the questioning. We also note that Rodriquez's failure to request to use the restroom facilities at the police station during the approximate seven hours of questioning strongly indicates that he was no longer intoxicated. The evidence in the record fails to support Rodriquez's claim that the interrogating officers took advantage of his alleged state of intoxication to persuade him to confess.

## TRICKERY

 The fact that the interrogating officers falsely stated to Rodriquez that the victim, on his deathbed, identified him as the assailant does not support a finding that the confession was involuntarily given. The voluntariness of a confession is not destroyed, and a confession induced by deception or trickery, is not inadmissible, unless the method used was calculated to produce an un-

truthful confession or was offensive to due process. *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *Johnson v. State,* 378 S.W.2d 76, 77 (Tex. Crim.App.1964); *Farmah v. State,* 789 S.W.2d 665, 672 (Tex.App.—Houston [1st Dist.] 1990), *rev'd on other grounds,* 883 S.W.2d 674 (Tex.Crim.App.1994); *Snow v. State,* 721 S.W.2d 943, 946 (Tex.App.—Houston [1st Dist.] 1986, no pet.); *Dotsey v. State,* 630 S.W.2d 343, 349 (Tex.App.—Austin 1982, no pet.).[9] The false information presented to Rodriquez was neither calculated to produce an untruthful confession nor violated due process. The information did not inject extrinsic considerations into Rodriquez's mind, compel him to consider other factors than his own guilt or innocence in deciding to make the confession, or influence his moral sense of right and wrong. *See Holland v. McGinnis,* 963 F.2d 1044, 1051–52 (7th Cir.1992), *cert. denied,* 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). Neither did the likelihood of Rodriquez's believing that the case against him was considerably stronger, due to the admissibility of the victim's alleged "dying declaration," cause the statement to be made involuntarily. The false information was just a small part of the overall interrogation scheme in which the officers several times over made certain that Rodriquez knew and understood his statutory *Miranda* warnings. *See id.* We cannot conclude that Rodriquez's due process rights were violated by the interrogating officers' falsely informing him that the victim had identified him as the assailant. *See Johnson,* 378 S.W.2d. at 77. Having concluded that Rodriquez's confession was voluntarily given, we overrule his second point of error.

The judgment is affirmed.

---

9. Although the actual trustworthiness of a confession procured by trickery does not seem to affect its admissibility, *see Farmah v. State,* 883 S.W.2d 674, 679–81 (Tex.Crim.App.1994) (Baird, J., concurring), the use of trickery and deception is still relevant to the question of whether, under the totality of the circumstances, the confession was made voluntarily. *See Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969).