

# NUMBER 13-25-00283-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                    Appellant,

v.

YOZMARA GARCIA,                                                         Appellee.

## ON APPEAL FROM THE 398TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca**
**Memorandum Opinion by Justice Fonseca**

Appellee Yozmara Garcia was charged by indictment with one count of intoxication manslaughter, a second-degree felony, and one count of intoxication assault, a third-degree felony. *See* TEX. PENAL CODE §§ 49.07, .08. The trial court granted Garcia's motion to suppress evidence of video-recorded statements she made to law enforcement. Appellant, the State of Texas, argues by one issue that the trial court erred in doing so.

We reverse and remand.

## I. BACKGROUND

The charged offenses arose out of a car accident which occurred in Pharr on November 17, 2023. Garcia was arrested after the accident, and she moved to suppress statements she made to Pharr Police Department officer Juan R. Contreras Jr. in a video-recorded custodial interview. Garcia argued the statements were not knowingly, intelligently, and voluntarily made, and were therefore inadmissible under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; article I, §§ 9 and 10 of the Texas Constitution; and articles 1.05 and 38.23 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.").

At a pre-trial hearing on the motion, Contreras testified that the accident occurred at around 11:57 or 11:58 p.m., and he arrived at the scene at around 12:10 a.m. on November 18. He was the lead investigator on the case. The following afternoon, at around 4:30 p.m., Contreras was advised that Garcia asked to talk to the lead investigator, so he met with her in an interrogation room at the police station.[1] Before the interview, Contreras read Garcia her *Miranda* rights from a form entitled "Pharr Police Department Miranda Warnings." *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966) ("[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of

---

[1] Contreras later stated that he "waited until the afternoon to interview her" because "she had come back from her medical clearance" at that time.

crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."). The form he used was entered into evidence and states:

> Before you are asked any questions, it is my duty to advise you of your rights and to warn you of the consequences of waving [sic] these rights.
>
> 1. You have the right to remain silent and not make any statement at all.
>
> 2. Any statement you make may be used as evidence against you at trial.
>
> 3. You have the right to have a lawyer present to advise you prior to and during any questioning.
>
> 4. If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning, and
>
> 5. You have the right to terminate the interview at any time.

Garcia initialed each numbered item; checked "yes" next to the questions, "Do you understand your Miranda warnings?" and "If so, would you like to waive your rights?"; and signed her name at the bottom of the form. Garcia proceeded to answer all of Contreras's questions regarding the subject accident; she never asked for an attorney or for the interview to stop. Contreras denied directly or indirectly promising Garcia anything in exchange for her statement, and he said Garcia was not deprived of "any basic necessities" such as food or water. He also opined that Garcia did not appear "extremely tired, sick, or injured" during the interview.

The video recording of the interview was entered into evidence and played for the

3

trial court. The court reporter transcribed the relevant part of the recording as follows:

[Contreras]:     I'm going to read your Miranda Warnings, and then after every question, after every number I read you, every warning, if you understand, I'm going to have you initial it. Okay.

If you don't, let me know like I explained to you. Okay. This is your copy so you can follow along (indicating). I'm going to start right there (indicating). These are your Miranda Warnings, Ms. Garcia.

"Before you are asked any questions, it is my duty to advise you of your rights, and to warn you of the consequences of waiving these rights." Do you understand that?

[Garcia]:     Yes.

[Contreras]:     Okay. Number one.

"You have the right to remain silent, and not make any statement at all." Do you understand that?

[Garcia]:     Yes.

[Contreras]:     Can you just sign here (indicating). Put your initials right here (indicating), acknowledging that you understand that—this one.

Number two. "Any statement you make may be used as evidence against you at your trial." Do you understand that?

[Garcia]:     Yes.

[Contreras]:     "You have the right to have a lawyer present"—

[Garcia]:     Yes.

[Contreras]:     —"and advise you prior and during any questions." Do you understand that right?

[Garcia]:     (No verbal response audible.)

[Contreras]:     Number four. "If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you, and advise you prior to and during any questioning." Do

4

you understand Number Four?

[Garcia]: Like, they'll give me a lawyer if I don't have one?

[Contreras]: Yeah. Once we're downstairs with the Judge, he can ask if you have—how to pay a lawyer [sic[2]]. If not, he'll start the process for you.

[Garcia]: Okay.

[Contreras]: Okay. And Number Five, "You have the right to terminate the interview at any[ ]time." So, that means you can start talking to us. And then, if you don't want to answer the question just say, "You know what, I can stop." That's what that—that means.

Do you understand your right?

[Garcia]: (No verbal response audible.)

[Contreras]: Then initial if you understand.

(Ms. Garcia complies.)

[Contreras]: Can you sign right here (indicating) that your rights were given to you.

[Garcia]: Do I need initial [sic]?

[Contreras]: No, the signature.

(Ms. Garcia complies.)

[Contreras]: I'm signing right here (indicating), because I was the one that read you your rights.

Okay. One more time, "Do you understand your Miranda Warnings?" The first set of rights that I read to you, do you understand them?

[Garcia]: Yes.

[Contreras]: Okay. Can you just checkmark this (indicating).

---

[2] The audio quality of the recording is poor. Contreras later testified that, in response to Garcia's request for clarification of warning number four: "I told her when you go downstairs you'll see a Judge, and you'll get a bond. And if you can't afford a lawyer, that's when the Judge starts the process for you to get you a lawyer."

(Ms. Garcia complies.)

[Contreras]:        "If so, would you like to waive your rights and talk to me?"

[Garcia]:           What do you mean, "Waive my rights?"

[Contreras]:        Like, you want to talk to me. Like, you want to talk to me, but remember you still have Number Five; at any[ ]time you want to stop talking, you can stop talking. Put, yes, that you would like to talk about your case.

[Garcia]:           And I sign again?

[Contreras]:        Sign again right here (indicating). It's 5:14 p.m.

Contreras stated that, if Garcia had ever asked for an attorney, he would have stopped the interview "and we would've just gone downstairs and put her back in booking, and gone with the Judge . . . to set her bond."

On cross-examination, Contreras agreed that he told Garcia "that she could get a lawyer, but not until she was downstairs" and spoke to the judge. He further agreed that according to her questions, Garcia did not initially know what it meant to waive her rights, and when she asked for clarification in that regard, he only specifically advised her of the fifth enumerated right. He also testified that he did not advise Garcia of the charges filed against her until toward the end of the half-hour-long interview; when he told her she was being charged with intoxication manslaughter, she realized her friend had died and started crying.

Garcia denied telling anyone at the jail that she wanted to speak to a detective. When asked whether she "underst[oo]d the rights that [Conteras] was giving you as you were putting your initials down," Garcia replied: "No." She explained that, after Contreras attempted to clarify her right to an appointed attorney, she believed that she could only see the judge to obtain the attorney after the interview was concluded. When asked why

6

she sought clarification as to waiver, Garcia explained "I couldn't really understand, like, the way he was explaining it. But I didn't want to waive my rights, I just wanted a lawyer present. And he kind of made it seem like I had to wait until afterwards to see the Judge first." She acknowledged that she never actually told Contreras she wanted an attorney, nor did she ever ask for the interview to stop.

On cross-examination, Garcia acknowledged that she previously worked as a correctional officer, but she denied being aware of *Miranda* rights before the events of this case. She agreed that she signed and initialed the form stating she understood and waived her rights, but she testified she did not in fact understand them "the way [Contreras] was saying it." When asked why she signed the form anyway and did not ask for further clarification, she said she "was, like, half asleep at the time."

The trial court granted the motion to suppress and issued the following factual findings:

1.  Defendant Yozmara Garcia was in the custody of the Pharr Police Department on November 18, 2023, when she was interrogated by Investigator Juan R. Contreras[] Jr.

2.  Investigator Contreras read a *Miranda* "form" apparently used by the Pharr Police Department to Defendant Garcia.

3.  This *Miranda* "form" did not contain the required warning that, "Any statement she makes may be used against her as evidence in court."

4.  Prior to this instance, Defendant Garcia had no exposure to *Miranda* warnings.

5.  When advised that she had the right to an attorney, Defendant Garcia requested clarification.

6.  When asked to clarify about Defendant "getting a lawyer," Investigator Contreras advised her[] the judge would address that issue after the interview.

7.  Defendant Garcia understood that she would see a judge after the

7

interview and that was when she would be given a lawyer.

8. When Investigator Contreras asked whether Defendant Garcia would waive her rights, she did not understand what it meant to waive her rights and again requested clarification. This request for clarification was met by Investigator Contreras advising Defendant Garcia that waiving her rights meant that she wanted to talk to him. Defendant Garcia relied on this clarification.

   a. Investigator Contreras[] did not clarify that Defendant could remain silent;

   b. Investigator Contreras[] did not clarify that she was entitled to an appointed lawyer; Investigator Contreras did not tell her she would get an appointed lawyer. Instead, Investigator Contreras advised Defendant Garcia that she could talk to the judge about the process of getting a lawyer once the interview was concluded.

9. Defendant was not advised of charges levied against her until the conclusion of the interview.

10. The Court further notes its observations of the in-court testimony and demeanor of the witnesses. Accordingly, this Court finds Investigator Contreras' in-court testimony not credible to this Court. This is especially true when confronted with the various clarifications requested by Defendant Garcia. The Court[] finds that a measure of deception was used by Investigator Contreras when Defendant Garcia asked for clarification regarding her right to an attorney and again when she asked for clarification regarding what it meant to "waive her rights." Therefore, this Court finds Investigator's in-court testimony/explanations not credible.

   By contrast, the Court finds Defendant's demeanor in the audio/video to be a genuine ignorance of those principles with which she was held to have understood and "waived." Given this, the Court finds that Defendant's in-court testimony to be credible [sic] when explaining the ignorance the court finds in the audio/video. The Court finds Defendant's in-court testimony credible and hereby gives it more weight than that of Investigator Contreras.

   The Court considered not only the in-court testimony, but also had the benefit of observing the demeanor of the witnesses in the audio/video recorded interview submitted as [evidence].

(Footnotes omitted.) *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (providing that "[i]n

all cases where a question is raised as to the voluntariness of a statement of an accused,

8

the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions"); *see also Ochoa v. State*, 707 S.W.3d 344, 360 (Tex. Crim. App. 2024) (concluding that abatement for findings under article 38.22, § 6 was unnecessary where "most of the relevant facts are contained in [a]ppellant's videotaped interview" and "the facts are largely uncontested").

Based on the foregoing, the trial court concluded that Garcia "did not knowingly, intelligently and voluntarily waive her *Miranda* [r]ights." This accelerated interlocutory appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5).

## II.    MOTION TO SUPPRESS

### A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Armstrong v. State*, 713 S.W.3d 893, 902 (Tex. Crim. App. 2025); *Ochoa*, 707 S.W.3d at 360; *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). First, we afford "almost complete deference" to the trial court's findings of historical fact as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Armstrong*, 713 S.W.3d at 902; *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013) (quoting *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009)). We do this because the trial judge is the sole judge of witness credibility and the weight to be given to witness testimony. *See Ochoa*, 707 S.W.3d at 360; *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). Second, "we review de novo the legal significance of the facts found by the trial court." *Armstrong*, 713 S.W.3d at 902.

"As a general rule, appellate courts view the evidence in the light most favorable to the trial judge's ruling, regardless of whether the judge granted or denied the

9

suppression motion." *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (footnote omitted). "Thus, courts afford the prevailing party 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'" *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). The ruling will be upheld if it is supported by the record and correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

## B.    Applicable Law

Article 38.22, § 3 of the Texas Code of Criminal Procedure provides that an oral statement made by a suspect in police custody is inadmissible as evidence unless, among other things, the accused is warned prior to the statement as provided in § 2 of that article and "knowingly, intelligently, and voluntarily" waives the rights set out in the warning. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2); *see id.* art. 38.21 ("A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."). The warnings required by article 38.22, § 2 are as follows:

(1)    [the accused] has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2)    any statement he makes may be used as evidence against him in court;

(3)    he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)    he has the right to terminate the interview at any time.

*Id.* art. 38.22, § 2(a); *see Miranda*, 384 U.S. at 436 (holding that similar warnings are

10

required by the Due Process Clause of the United States Constitution). An accused must be administered these warnings or their "fully effective equivalent[s]" for a statement to be admissible. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(e)(2); *see Sosa v. State*, 769 S.W.2d 909, 916 (Tex. Crim. App. 1989) ("[A] warning which is only slightly different from the language of the statute but which conveys the exact meaning of the statute is sufficient to comply with the statute.").

The State has the burden of showing, by a preponderance of the evidence, that a suspect knowingly, intelligently, and voluntarily waived their *Miranda* rights. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010); *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). The waiver need not be explicit or written. *See, e.g.*, *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.—San Antonio 2000, pet. ref'd).

> There are two facets to any inquiry with respect to the adequacy of a purported waiver of *Miranda* rights: First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second[,] the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Leza*, 351 S.W.3d at 349 (first quoting *Joseph*, 309 S.W.3d at 24; and then quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001)).

> It will suffice to render a waiver knowing and intelligent . . . that the accused has been made aware, and fully comprehends, that he has the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law.

*Id.* at 350.

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Moran v. Burbine*, 475 U.S. 412, 422–23 (1986); *Leza*, 351 S.W.3d at 349.

Voluntariness is measured according to the totality of the circumstances. *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989). This approach requires the consideration of "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. *Joseph*, 309 S.W.3d at 25 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

"The determination of whether a statement is voluntary is a mixed question of law and fact, i.e., an application of law to a fact question." *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000). Accordingly, we defer to the trial court's resolution of this question only if that resolution "turn[ed] on an evaluation of credibility and demeanor." *Armstrong*, 713 S.W.3d at 902; *Abney*, 394 S.W.3d at 547.

## C.    Analysis

The State argues that the trial court erred in suppressing Garcia's statement for several reasons, including: (1) the written warning form substantially complied with article 38.22, § 2; (2) Garcia never requested an attorney or for the interview to stop; (3) Contreras was not "being intimidating, coercive, or deceptive" in his responses to Garcia's requests for clarification; and (4) the "indisputable video evidence" shows that Garcia's waiver "resulted from a free and deliberate choice without intimidation, coercion, or deception." *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (declining to defer to the trial court's credibility determination where a "videotape present[ed] indisputable visual evidence contradicting essential portions of [the witness's] testimony").

On appeal, Garcia does not dispute that the written waiver form contained the "fully

effective equivalent[s]" of the warnings listed in article 38.22, § 2.[3] *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(e)(2); *Cockrell v. State*, 933 S.W.2d 73, 91 (Tex. Crim. App. 1996) (concluding, where waiver form stated "any statement I make may be used in evidence against me at trail [sic]," that "[t]he warnings on the face of appellant's confession substantially comply" with article 38.22, § 2 even though "they do not state appellant's statement can be used against him at 'trial' or in 'court'"). Nor does she claim that she ever asked for an attorney or to stop the interview. Instead, Garcia principally asserts that the evidence supports the trial court's finding that Contreras employed "a measure of deception" in responding to Garcia's requests for clarification, and that this finding in turn supports the judgment.

The fact that police made misrepresentations to a suspect during an interrogation "is a relevant factor in assessing whether the suspect's confession was voluntary, but it is insufficient to render an otherwise voluntary confession inadmissible." *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)); *State v. Cielencki*, 706 S.W.3d 634, 643 (Tex. App.—Austin 2025, pet. ref'd). The misrepresentation must be viewed in the context of the totality of the circumstances. *Green*, 934 S.W.2d at 99. "Some types of police deception employed during custodial interrogation, designed to elicit a confession from the accused, are constitutionally permissible." *Id.*; *see, e.g.*, *Oursbourn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008) (noting that "lying about the state of the evidence is not the sort of 'overreaching' that implicates the Due Process Clause, as long as the subterfuge used is not one likely

---

[3] As noted, the trial court stated in its findings that the warning form "did not contain the required warning that, 'Any statement she makes may be used against her as evidence in *court*'" (emphasis added). However, the court's ruling was based on the involuntariness of the waiver, not on the insufficiency of the written warnings.

to produce an untrue statement"). "The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined." *Green*, 934 S.W.2d at 99–100 (citing *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

Courts have held that a police misrepresentation does not render a statement involuntary unless it is "calculated to produce an untruthful confession or was offensive to due process." *See Rodriquez v. State*, 934 S.W.2d 881, 890–91 (Tex. App.—Waco 1996, no pet.) ("The fact that the interrogating officers falsely stated to [appellant] that the victim, on his deathbed, identified him as the assailant does not support a finding that the confession was involuntarily given."); *Snow v. State*, 721 S.W.2d 943, 946 (Tex. App.— Houston [1st Dist.] 1986, no pet.) ("[V]oluntariness is not destroyed, and a confession induced by deception or trickery is not inadmissible, unless the method used was calculated to produce an untruthful confession or was offensive to due process."); *see also Oursbourn*, 259 S.W.3d at 182. For example, in *Lynumn v. Illinois*, 372 U.S. 528 (1963), the police told a suspect that she would lose her welfare benefits and custody of her children if she did not confess. The United States Supreme Court considered this misrepresentation improperly coercive because it did

> more than affect the suspect's belief regarding her actual guilt or innocence, and judgments regarding the evidence connecting her to the crime. It also distorted the suspect's rational choice . . . by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled. This extrinsic consideration not only impaired free choice, but also cast doubt upon the reliability of the resulting confession, for one can easily imagine that a concerned parent, even if actually innocent, would confess and risk prison to avoid losing custody of her children and their welfare benefits.

*Holland v. McGinnis*, 963 F.2d 1044, 1051–52 (7th Cir. 1992) (internal citations omitted); *see Lynumn*, 372 U.S. at 534 ("We think it clear that a confession made under such

14

circumstances must be deemed not voluntary, but coerced."). On the other hand, in *Holland*, a police officer's misrepresentation concerning the strength of the evidence against the suspect did not render the suspect's confession involuntary because it

> interfered little, if at all, with his "free and deliberate choice" of whether to confess, for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the suspect's] will by distorting an otherwise rational choice of whether to confess or remain silent.

*Holland*, 963 F.2d at 1051 (citation omitted).

Even when viewed in the light most favorable to the trial court's ruling, the evidence does not support a finding that Contreras's conduct was so coercive or deceptive as to overbear Garcia's will. The claim of coercion is based on Contreras's responses to Garcia's two requests for clarification regarding (1) her right to appointed counsel, and (2) the meaning of "waive your rights." But Garcia unequivocally stated that she understood the first two enumerated warnings—regarding her right to remain silent and that anything she says may be used against her—*before* she asked for clarification. *See Moran*, 475 U.S. at 422–23; *Leza*, 351 S.W.3d at 349–50.

In any event, we agree with the State that Contreras made no misrepresentations to Garcia at any point during the interview. The officer read each of the warnings verbatim as they appeared on the form. Contreras twice specifically advised Garcia that she had the right to have counsel present "prior to and during" any questioning. After Garcia asked Contreras to clarify her right to counsel, the officer confirmed that Garcia's understanding of that right—"they'll give me a lawyer if I don't have one"—was correct. He then explained that a lawyer would only be appointed when she appeared before a judge, which is true.

15

He did not say or imply anything that would contradict or otherwise cast doubt on the warnings he previously gave, which explicitly advised Garcia that she had the right to have counsel present "prior to and during any questioning." Specifically, there was nothing in Contreras's response from which it could be inferred that counsel would not be appointed until *after* the interview. The trial court's findings in this regard are therefore not supported by the record. According to the video recording, Garcia never expressed any uncertainty or concern as to the timing of the potential appointment, and she did not ask for further clarification. Instead, she signed her initials next to each enumerated warning indicating that she understood all of them.

Next, when Garcia asked what "waive my rights" means, Contreras responded truthfully that it means "you want to talk to me." In the context of the interview, Contreras's response could have had only one possible meaning—i.e., that "waive my rights" means "you want to talk to me" *notwithstanding those rights*. Contreras then proceeded to explain that, even if Garcia elected to waive her rights, she would still retain the right to terminate the interview at any time. There is nothing about Contreras's answer which could give rise to any legitimate doubt or ambiguity regarding the meaning of "waive my rights." Again, Garcia did not express any confusion or uncertainty about Contreras's answer but rather immediately expressed her willingness to sign the form explicitly indicating that she intended to waive the rights which had just been explained to her. And unlike the police conduct in *Lynumn*, Contreras's answers to Garcia's requests for clarification did not inject any extrinsic considerations which would distort Garcia's otherwise rational choice to waive her rights, or which would cast doubt upon the reliability of her subsequent statements. *See Lynumn*, 372 U.S. at 534; *Holland*, 963 F.2d at 1051–52.

We note that evidence of police misconduct is not always necessary to establish an involuntariness claim under article 38.22. When a complaint of involuntariness is made under the Due Process Clause or *Miranda*, the statement may be excluded "only when there is police overreaching." *Oursbourn*, 259 S.W.3d at 169; *see id.* at 170 (noting that "[t]he Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors," and "[a]bsent police misconduct causally related to the confession, there is 'simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law'"); *see also Leza*, 351 S.W.3d at 349 ("Before it may be said that a waiver of a *Miranda* right is involuntary, . . . there must be some element of official intimidation, coercion, or deception."). In contrast, a statutory involuntariness claim can be, but need not be, predicated on police overreaching; thus, analysis of such a claim could entail a "sweeping inquir[y] into the state of mind of a criminal defendant who has confessed" to determine whether he or she acted voluntarily. *Oursbourn*, 259 S.W.3d at 172. In *Oursbourn*, the Texas Court of Criminal Appeals observed that statutory involuntariness claims have been sustained in the following situations:

> (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have knowingly, intelligently and voluntarily waived his rights; (3) the suspect lacked the mental capacity to understand his rights; (4) the suspect was intoxicated, and he did not know what he was signing and thought it was an accident report; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into for questioning by several persons armed with six-shooters.

*Id.* at 172–73 (quotations and citations omitted).

The facts at bar do not rise to the level of those situations. Aside from Contreras's alleged "deception," the only evidence of involuntariness in the record is Garcia's

17

conclusory and self-serving testimony at the suppression hearing that she was "half asleep" during the interview and "didn't want to waive my rights." However, the video recording, which we have reviewed in its entirety, shows that Garcia answered Contreras's substantive questions clearly and willingly throughout the interview and did not appear fatigued or otherwise physically or mentally unable to understand the ramifications of her choice to do so without counsel present. *See Linton v. State*, 275 S.W.3d 493, 508 (Tex. Crim. App. 2009) (noting that, "in keeping with the notion that the question on appeal is whether the defendant received due process rather than a perfect translation," "100% comprehension" is "not the constitutional requirement"). Moreover, there is no evidence that Garcia was deprived of any necessities—including sleep—or was interrogated for an inordinate amount time or otherwise subject to any pressures beyond those inherent in any custodial interview.

The trial court is entitled to believe witness testimony as it sees fit, and we must generally defer to its determinations in that regard. *See Ochoa*, 707 S.W.3d at 360; *Moore*, 395 S.W.3d at 158. Here, however, the only issue before the trial court was the voluntariness of Garcia's written waiver, and the entire process leading up to that waiver was captured on video. Thus, though the trial court emphasized in its findings that it found Garcia's in-court testimony credible and Conteras's not credible, the case does not turn on those credibility determinations. *See State v. Terrazas*, 4 S.W.3d 720, 726 n.5 (Tex. Crim. App. 1999) ("An example where the resolution of the ultimate question of voluntariness would turn on an implied fact finding involving an evaluation of credibility and demeanor would be where a trial court grants a motion to suppress on conflicting testimony that the police tortured a confession out of a suspect."). Instead, the case turns

on an objective evaluation of the undisputed facts as demonstrated in the video recording. *See Carmouche*, 10 S.W.3d at 332 (observing that "the nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor'"); *see also Terrazas*, 4 S.W.3d at 725–26 (finding, where officer told appellee "what had to be" in her statement, that "since the ultimate resolution of the voluntariness question does not turn on this implied fact finding, we may review de novo the . . . ruling on the voluntariness question").

Having reviewed all of the record evidence in the light most favorable to the trial court's ruling, we conclude that the State established, by a preponderance of the evidence, that Garcia's waiver of rights was made "knowingly, intelligently, and voluntarily" under the totality of the circumstances. *See Terrazas*, 4 S.W.3d at 728 (finding that officer telling appellee "what had to be" in her statement "did not constitute wringing the statement out of appellee against her will" and therefore concluding that trial court erred by suppressing confession as involuntary); *Oliver*, 29 S.W.3d at 193 (reaching the same conclusion where appellee did not explicitly waive his rights but officer "read each art[icle] 38.22 right to [appellee]"; appellee "indicated to [the officer] that he understood [each] right"; and "without any hesitation, [appellee] proceeded to discuss the circumstances surrounding the murder" with the officer). The trial court's conclusion to the contrary was error. We sustain the State's issue on appeal.

### III. CONCLUSION

The trial court's judgment is reversed, and the cause is remanded with instructions to deny Garcia's motion to suppress and for further proceedings consistent with this

19

memorandum opinion.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
8th day of January, 2026.